2019 IL App (3d) 170168

Opinion filed October 1, 2019

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2019

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois. |
| Plaintiff-Appellee, | ) ) | Appeal No. 3-17-0168 |
| v. | ) | Circuit No. 14-CF-2407 |
| | ) | |
| ALOYSIUS A. ALEXANDER, | ) ) | Honorable Carla Alessio-Policandriotes, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE SCHMIDT delivered the judgment of the court, with opinion. Justices Carter and McDade concurred in the judgment and opinion.

**OPINION**

¶ 1 Defendant, Aloysius A. Alexander, appeals his convictions and sentences for first degree murder, aggravated battery with a firearm, and unlawful use of a weapon by a felon (UUWF), arguing (1) his UUWF conviction should be reversed because it was predicated on a void prior conviction and he should be resentenced on his other convictions because the court considered the void conviction and (2) the court erred by failing to appoint counsel to represent him on his posttrial claims of ineffective assistance of counsel. We affirm in part, reverse in part, and remand for resentencing.

¶ 2                                     I. BACKGROUND

¶ 3        The State charged defendant with two counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2014)), one count of aggravated battery with a firearm (*id.* § 12-3.05(e)(1)), and one count of UUWF (*id.* § 24-1.1(a)). The indictment for UUWF stated that defendant had previously been convicted of aggravated unlawful use of a weapon (AUUW).

¶ 4        Prior to trial, defendant filed a *pro se* motion for substitution of judge naming Judge Daniel Rozak. Since the public defender's office represented defendant, the court struck the motion. However, on the court's own motion it reassigned the case to Judge Sarah Jones. Thereafter, defendant retained private counsel. The record shows that on June 16, 2016, two motions for substitution of judge were filed. The first motion named Judge Jones and Judge Carla Alessio-Policandriotes as prejudiced against defendant. The second motion solely named Judge Jones. The court ultimately assigned the case to Judge Alessio-Policandriotes without any objection, and the case proceeded to a bench trial.

¶ 5        The evidence at trial established that on the evening of December 5, 2014, Miya Morris went to an apartment where Johnny Lockhart and his son, Ledontia, lived. Ledontia was in his bedroom when he heard Johnny ask Morris why she had not called or texted Ledontia before coming over so late. Ledontia then exited his room and asked Morris if they could go outside to talk. Ledontia and Morris went to the parking lot, and Morris was upset because she believed that Ledontia had taken money from her. Johnny called the police to have Morris removed from the premises. Officer Robert Anderson responded, told Morris that she needed to leave, and Morris did so.

¶ 6        After that, Michael Smith, Morris's boyfriend and Ledontia's friend, began contacting Johnny and Ledontia threatening to fight them. He believed that Johnny had threatened to push Morris. Smith intended to go to the Lockharts' apartment to fight Ledontia. On his way, he

picked up Brian Gregory and defendant. Ledontia, Smith, and Gregory all knew defendant by his nickname, "June." At some point, Ledontia heard a car door slam and people running up the stairs toward the apartment. He opened the door, and defendant, Gregory, and Smith were standing in front of the door. Ledontia told them they should go down to the parking lot to fight. They went down to the parking lot, and Smith threw two punches at Ledontia. Ledontia deflected his punches and pushed Smith back. The two of them argued until Johnny came outside. Johnny told Smith, Gregory, and defendant to get off his property.

¶ 7        At that point, a gun was discharged two times. Ledontia stated,

> "As I was trying to turn [Johnny] to go up the stairs, I look back, I see them all walking towards the car. I'm figuring like they just fittin' to just leave. Then, like, God made me look again. I just saw the fire coming from [defendant's] hand. I just grabbed my pops. Then my father told me I was shot."

Ledontia said the fire looked "[l]ike when somebody shoots a gun." He also heard "a bang." Smith stated that he could see Johnny, Ledontia, and Gregory and knew the gunshot did not come from them. Smith said there was no doubt in his mind that defendant had shot the gun. Gregory heard the shots coming from behind him. Gregory turned to look and saw defendant holding a gun and fire coming from it. Defendant was wearing a black hooded sweatshirt with the hood up. Smith, Gregory, and defendant ran to Smith's car. Smith asked defendant "why would you do that[?]" Defendant said, "I don't know, shut up and drive." Smith drove for a short period of time, and then defendant asked Smith to stop the car. Defendant exited the car near his apartment and said, "don't say shit."

¶ 8 Ledontia blacked out after the first shot had hit him, and when he awoke, he realized that Johnny had also been shot. Johnny told Ledontia to get help. Ledontia crawled up the stairs, and Johnny's girlfriend met him in the apartment. Ledontia told her to call 911; he then went back down the stairs. He left blood on the floor of the apartment. Officer Anderson and Sergeant Scott Cammack arrived at the scene around 12 a.m. on December 6 and saw Ledontia holding his torso in pain. Johnny was covered in blood and was not moving. Cammack asked Ledontia who shot him, and Ledontia said "June." Cammack repeated and spelled "June" back to Ledontia, and Ledontia confirmed. Cammack asked Ledontia for more information about June, but Ledontia was unable to respond as he was holding his chest and having difficulty breathing. Ledontia spent 11 days in the hospital recovering from the gunshot wound. After he was taken to the hospital, he never saw Johnny again. The autopsy revealed that Johnny died of multiple gunshot wounds. Ledontia and Gregory later identified defendant as the shooter in a lineup.

¶ 9 Sergeant Chris Delaney testified that on December 6, 2014, he was a crime scene technician and responded to the scene. He observed Johnny dead at the scene. He took photographs, recovered spent projectiles at the scene, and observed blood in the Lockharts' apartment.

¶ 10 Detective Jeffrey German testified that, as part of the homicide investigation, he reviewed surveillance videos from an apartment facing 301 North Bluff Street. The video showed a man walking from behind 311 North Bluff Street to the front door of the apartment complex at 301 North Bluff Street at approximately 12:13 a.m. on December 6, 2014. The man approached the door to the apartment complex and appeared to motion toward the window. He then walked toward the parking lot and then back toward the door. At that point, a person inside the complex opened the door, and the man entered the apartment complex. About seven minutes later, a

woman and two children exited the door, followed by the man. They entered a vehicle and drove away.

¶ 11 The police executed a search warrant at 301 North Bluff Street, Apartment 307. At the apartment, the officers found documents on the kitchen counter with defendant's name on them and the address of 301 North Bluff Street, Apartment 307. The documents were a red light camera violation notice dated October 21, 2014, and a collection agency letter for medical services dated November 10, 2014. Defense counsel objected to the admittance of the letters. After hearing the argument, the court said,

> "These are billing statements that are purported to be for [defendant], and each of them consistently indicating his address of 301 North Bluff Street, Apartment 307, Joliet, Illinois. Indicating that with, apparently, Provena St. Joe's Medical Center and the Secretary of State, that is the address in which he expects to receive and hopes to receive mail placed in the U.S. mail. And I'll accept that for what they are."

¶ 12 The officers also found a black hooded sweatshirt on the kitchen table and ammunition in a clothes hamper. The ammunition included five .38-caliber bullets: three were Winchester, one was Federal, and one was W-W. The officers recovered a .38-caliber revolver that had been covered in leaves near 311 and 316 North Bluff Road. The revolver had six shell casings inside: four were Federal, one was Winchester, and one was W-W. An expert in forensic science tested the gun and the spent projectiles obtained at the scene and determined that the projectiles came from the gun. A fingerprint expert tested the gun, casings, and projectiles but did not find any usable fingerprints.

¶ 13    Officer John Ross was a detective in 2014 and processed defendant at the jail on December 6, 2014. He said, "I can't give you an exact time. It was sometime in the afternoon." Defendant asked "if his girlfriend, who was upstairs being questioned by detectives, was going to be in trouble." Ross had not asked defendant anything about his girlfriend before this. Ross told defendant that he "did not know what was going to happen to his girlfriend." Defendant then asked "why she would be in any trouble." Ross replied, "because she *** helped you try to get away with murder." Defendant said, "she didn't have anything to do with it." Ross said, "that's what you told the detectives upstairs, that you guys didn't have anything to do with it." Defendant then said, "she really didn't have anything to do with it." The conversation then ended. Defense counsel moved to strike Ross's testimony and bar the evidence presented because Ross did not know if the conversation had been recorded. Ross did not read defendant his *Miranda* rights before answering defendant's questions. The court noted that defense counsel had not filed a pretrial motion to suppress but stated that it would allow counsel to file a written motion. Defense counsel asked for the motion to be heard when the State rested, and the court agreed. Defendant was interviewed at the jail at 2:41 p.m. on December 6, 2014, but the interview ended at 3:14 p.m. when defendant asked for counsel.

¶ 14    The State entered into evidence a certified copy of defendant's prior conviction, showing that he had been convicted of AUUW pursuant to section 24-1.6(a)(1) of the Criminal Code of 1961 (Code) (720 ILCS 5/24-1.6(a)(1) (West 2008)). The State then rested, and defendant moved for a directed verdict. The court stated that before it ruled on the motion for directed verdict, it needed to hear and rule on the motion to suppress the testimony of Ross. Defense counsel stated that he was withdrawing that motion. The court then denied the motion for directed verdict.

¶ 15　　　　The defense called Officer Robert Korczak who testified that he was in the back of the ambulance with Ledontia. Ledontia told him that he had a problem with a man at a bar and that man came to his house to fight him. He described the man as a "little guy." However, Korczak specifically asked Ledontia who shot him, and Ledontia said, "June."

¶ 16　　　　After taking the matter under advisement, the court found defendant guilty on all counts. At sentencing, the State asked the court to take defendant's criminal history into account. The court stated that it considered all the information presented but did not otherwise explain its decision. The court sentenced defendant to 56 years' imprisonment for first degree murder, 12 years' imprisonment for aggravated battery with a firearm, and 3 years' imprisonment for UUWF. The 12- and 3-year sentences would run concurrent to each other and consecutive to the 56-year sentence.

¶ 17　　　　Defendant filed a *pro se* motion for a new trial, alleging *inter alia*, that defense counsel was ineffective for failing to file (1) motions *in limine* to prevent the introduction of the letters, the hooded sweatshirt, and the ammunition found at the apartment; (2) a motion to dismiss after Ross testified that he did not read defendant his *Miranda* rights when defendant asked the questions about his girlfriend; and (3) a motion to exclude witnesses. Defendant attached three *pro se* motions *in limine*, attesting, *inter alia*, that his mailing address was actually 300 North Bluff Street, Apartment 403, and he had lived there since 2010. Defense counsel also filed a motion for a new trial, arguing that defendant was not proven guilty beyond a reasonable doubt and the court erred in allowing evidence of the ammunition and hooded sweatshirt because they had not been subjected to forensic testing. Defense counsel also filed a motion to reconsider sentence.

¶ 18     The court conducted a preliminary *Krankel* inquiry regarding defendant's claims of ineffective assistance of counsel. Defendant stated that counsel did not present any pretrial motions when defendant had asked him to. The following exchange occurred between the court and defendant.

> "THE COURT: As it relates to each of those, you communicated before trial with [defense counsel] asking him to file these pleadings on your behalf, is that what you're saying?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Okay. Please tell me more.
>
> THE DEFENDANT: And right after that, I got a substitution of judge. I was originally in front of Rozak. And I was placed in front of Jones. I put a substitution of judge in my own *pro se* motion because he wouldn't do it for me. I had to do it myself. I don't know if he adopted it or—
>
> THE COURT: Did you sub out two judges, Judge Rozak and Judge Jones?
>
> THE DEFENDANT: Judge Jones.
>
> THE COURT: Okay. And that's why they did not try the case. The matter, I believe, is scheduled before me, correct?
>
> THE DEFENDANT: Yes, correct.
>
> THE COURT: Okay. And those—so your motion regarding substitution of judge was, in fact, addressed?
>
> THE DEFENDANT: Yes.

THE COURT: Okay.

THE DEFENDANT: And I was placed in front of you. Two days later I came in and we set a trial date.

THE COURT: Okay.

THE DEFENDANT: And you asked before we proceeded, do we have any motions to file. And he clearly, on the record, said no. When I asked him before trial to put in those pretrial motions, which he failed to do."

¶ 19    Defendant further stated that counsel did not file a motion to suppress based on Ross's testimony, even though the court had given counsel the opportunity to do so. He also stated that counsel had not sufficiently communicated with him. The court said,

"As it relates to your pleading, if I may, regarding the substitution of the judges that would otherwise have been assigned to this case, though it was your pleading and you filed it, there is no harm to you in not having your case tried in front of Judge Rozak or Judge Jones because your substitution request[s] were, in fact, addressed on your behalf and they were not the trial judges, I was. Okay?"

Defendant agreed. The court then said,

"All right. As it relates to the pleadings that you have filed, that you thought should have been filed on your behalf, first the motion regarding physical evidence, the hooded sweatshirt, ammunition and the U.S. mail. The pleadings, as you know, were not filed by [defense counsel] for the

Court to rule that they were not admissible, that the State would be barred from presenting it. You're absolutely right that it was not filed.

However, I can suggest to you that even the pleadings that you have filed, if they were timely filed before the evidence or the trial began, they would not have been granted. And the reason is this, in my opinion: The Court does not bar evidence because it is on the basis of what was presented here. It goes to the weight to be given to that evidence. So the credibility to give the evidence, the strength or weakness of the evidence. So physical evidence, the hooded sweater, U.S. mail, things like that, the ammunition, the three that you identified, the State had proper foundations, so it was not a nature of chain of evidence. So it could not be barred in that manner.

The quality of the evidence is what you're suggesting the Court should have barred because it was not tested for DNA. It was not tested for this. The Court would not have barred those, [defendant], because I don't have the right do so. I can't force the State to do—to get all the testing done. They present their evidence and the quality of the evidence, of what they have. I would not have ruled correctly, if I barred that evidence, in my opinion. It goes to the weight of the evidence. It goes to the character of the evidence. It goes to the credibility of the evidence. Okay?

So if you communicated that to [defense counsel] and he said I'm not filing those pleadings, that his trial strategy, of course, and based on

his training, he may have communicated to you, I'm not doing that because, in fact, it would not have been a pleading that would have been well-founded in law or fact. Okay? And lawyers don't and shouldn't file pleadings that are not founded in law or in fact, okay? It's called a frivolous pleading. Do you understand the difference?"

Defendant agreed that he did.

¶ 20    The court confirmed that defendant did not have any other ineffective assistance of counsel claims to present and then asked defense counsel whether he believed he "had sufficient communication, according to the standards that were necessary to protect his interest and answer what was necessary and to prepare for trial." Counsel stated that he did. They then discussed the motion for substitution of judge, noting that there was a pleading in the file that named Judge Alessio-Policandriotes. The court said,

> "[W]hen the matter was assigned to me, that was withdrawn. And each and every court date thereafter he consented to the matter to be before this Court. In fact, he waived his trial by—[defense counsel], in fact, he waived his trial by jury and asked for a bench trial in front of me.
>
> ***
>
> *** Just because my name is in there doesn't mean anything. I'm sure there was additional communication often by this Court."

The court found that defendant did not meet his threshold obligation in alleging ineffective assistance of counsel. The court then considered the motion for a new trial and to reconsider sentence brought by defense counsel and denied the motions.

¶ 21                                    II. ANALYSIS

- 11 -

¶ 22     On appeal, defendant argues (1) because his 2009 conviction for AUUW was void, his conviction for UUWF should be vacated and his remaining convictions should be remanded for resentencing and (2) the court should have appointed counsel and advanced defendant's claims of ineffective assistance of counsel to a full *Krankel* hearing. Pursuant to our supreme court's recent decision in *In re N.G.*, 2018 IL 121939, we find that defendant's prior void *ab initio* conviction for AUUW could not be used as a predicate offense for UUWF. Because the record is not clear how the court considered the conviction in sentencing defendant for first degree murder and aggravated battery with a firearm, we remand for resentencing. Moreover, we find that the court properly denied defendant's ineffective assistance of counsel claims after a preliminary *Krankel* inquiry.

¶ 23                    A. Void Conviction

¶ 24     The court found defendant guilty of UUWF under section 24-1.1(a) of the Code, which states, in pertinent part, "It is unlawful for a person to knowingly possess on or about his person or on his land or in his own abode *** any firearm or any firearm ammunition if the person has been convicted of a felony under the laws of this State or any other jurisdiction." 720 ILCS 5/24-1.1(a) (West 2014). In sum, in order for defendant to have been convicted under this statute, he had to have previously been convicted of a felony.

¶ 25     The only felony on defendant's record was a 2009 Class 4 felony conviction for AUUW. See 720 ILCS 5/24-1.6(a)(1), (d) (West 2008). Section 24-1.6(a)(1) of the Code stated,

          "A person commits the offense of [AUUW] when he or she knowingly:

               (1) Carries on or about his or her person or in any vehicle or

          concealed on or about his or her person except when on his or her land or

- 12 -

in his or her abode or fixed place of business any pistol, revolver, stun gun or taser or other firearm[.]" *Id.* § 24-1.6(a)(1).

However, our supreme court in *People v. Aguilar*, 2013 IL 112116, and *People v. Burns*, 2015 IL 117387, subsequently held that the AUUW offense in section 24-1.6(a)(1) is unconstitutional and invalid. There is no question that defendant's AUUW was based on this facially unconstitutional statute.

¶ 26    Thus, the question becomes whether a defendant's unconstitutional AUUW conviction may serve as the predicate felony conviction for UUWF. In discussing *People v. McFadden*, 2016 IL 117424, ¶¶ 1, 27, our supreme court stated that

> "based on the language of the UUWF statute, that where a defendant has not taken affirmative action to have a court set aside the initial conviction and therefore still has an extant, undisturbed felony conviction on his record at the time he engaged in the conduct on which the subsequent UUWF prosecution was predicated, the elements of the UUWF statute are satisfied and the UUWF conviction may stand, regardless of whether the initial conviction might be subject to vacatur later on the grounds that it was unconstitutional." *N.G.*, 2018 IL 121939, ¶ 62 (discussing *McFadden*).

In doing so, the court relied on the United States Supreme Court's decision in *Lewis v. United States*, 445 U.S. 55 (1980). *McFadden*, 2016 IL 117424, ¶ 22. In *Lewis*, the petitioner attempted to overturn his federal conviction for being a felon in possession of a firearm by challenging the use of his state felony conviction as the predicate offense because he had been without the benefit of counsel. *Lewis*, 445 U.S. at 57-58. The *Lewis* Court rejected this argument, stating "the

- 13 -

fact of a felony conviction imposes a firearm disability until the conviction is vacated or the felon is relieved of his disability by some affirmative action." *Id.* at 60-61.

¶ 27     However, in 2018, our supreme court revisited the issue in a different context in *N.G.*, 2018 IL 121939. In *N.G.*, the court considered whether a parent's unconstitutional AUUW conviction could be used as a predicate for terminating parental rights. *Id.* ¶ 23. The court stated that "[w]hen a statute is found to be facially unconstitutional in Illinois, it is said to be void *ab initio*; that is, it is as if the law had never been passed." *Id.* ¶ 50. Stated another way, "It was not, is not, and could never be a crime." *Id.* ¶ 36. Thus, "the conviction must be treated by the courts as if it did not exist, and it cannot be used for any purpose under any circumstances." *Id.* A conviction void in this way, like the AUUW conviction, could be challenged at any time, in any court with jurisdiction, and is not subject to forfeiture. *Id.* ¶¶ 43, 56. "[I]f the constitutional infirmity is put in issue during a proceeding that is pending before a court, the court has an independent duty to vacate the void judgment and may do so *sua sponte*." *Id.* ¶ 57. The court summarized its holding as follows:

> "[A] facially unconstitutional statute and any conviction based on the statute must be treated as if they *never existed*. Because they are nonexistent, as a matter of federal constitutional law, and must therefore be ignored by the courts, using them against a defendant in any subsequent proceeding, civil or criminal, is not only conceptually impossible (if something has no legal existence how can it be given any legal recognition?) but would subvert the very constitutional protections that resulted in the statute being found facially invalid to begin with and is incompatible with the United States Supreme Court's command that when,

- 14 -

as under *Aguilar* and here, the conduct penalized by a statute is constitutionally immune from punishment, that determination must be given complete retroactive effect." (Emphasis in original.) *Id.* ¶ 74.

¶ 28    The Fourth District applied this holding and held that an unconstitutional AUUW conviction may not be used as a predicate offense for armed habitual criminal. *People v. Cavette*, 2018 IL App (4th) 150910, ¶ 26.

¶ 29    Based on *N.G.*, we find defendant's AUUW conviction void *ab initio*. See *N.G.*, 2018 IL 121939, ¶ 50. We, therefore, vacate his AUUW conviction. See *id.* ¶¶ 43, 56-57. Because his AUUW conviction was void, it could not be used by the court for any purpose, including as a predicate for UUWF. *Id.* ¶¶ 36, 74. Thus, we reverse defendant's conviction for UUWF. Further, we remand for a new sentencing hearing on defendant's other convictions. The State presented defendant's AUUW conviction to the court at sentencing and asked the court to consider it in sentencing defendant. Again, the AUUW conviction cannot be used for any purpose, including to increase his punishment for a new offense. See *id.* ¶ 38. The record does not indicate to what extent the court considered the AUUW conviction when crafting the sentences for defendant's other convictions.

¶ 30    In coming to this conclusion, we reject the State's contention that we should still follow *McFadden*. In *N.G.*, the supreme court noted that its holding was contrary to its holding in *McFadden*. *Id.* ¶ 64. The court first distinguished the facts of *McFadden*, noting that the record in *McFadden* did not indicate under which provision of the AUUW statute the defendant had previously been convicted. *Id.* Therefore, the court could not conclude that the defendant's prior conviction was in fact based on the unconstitutional provision. *Id.* Moreover, the court noted that the defendant in *McFadden* never actually requested that his prior conviction be vacated. *Id.*

¶ 66. The defendant's conviction in *N.G.* was in fact under the unconstitutional AUUW provision, and he had asked that his conviction be vacated. *Id.* ¶¶ 64, 66. Second, the court found *McFadden* "problematic because of the line of United States Supreme Court authority on which it [was] based." *Id.* ¶ 67. The court in *McFadden* failed to consider or address *Montgomery v. Louisiana*, 577 U.S. ___, 136 S. Ct. 718 (2016), "or the numerous earlier United States Supreme Court cases which have consistently held that convictions based on facially unconstitutional statutes are void, can be given no effect, and must be treated by the courts as if they do not exist." *N.G.*, 2018 IL 121939, ¶ 67. Third, the court stated that, in relying on *Lewis*, it

> "failed to take into account a fundamental distinction between the constitutional flaws afflicting the two predicate offenses. In contrast to *McFadden*, *Lewis* did not present a situation where the prior offense was based on a facially unconstitutional statute that penalized conduct the state had no power to punish, and no second amendment concerns were at play." *Id.* ¶ 71.

Stated another way, where a conviction is obtained through a constitutional deficient procedure, like in *Lewis*, a defendant may still be guilty of or criminally culpable for the underlying act. See *id.* ¶ 39. Therefore, a conviction after a trial in which a constitutionally deficient procedure was used "may be used for some purposes but not for others." *Id.* ¶ 72. However, where the conviction was based on a facially unconstitutional statute, like in *McFadden* and *N.G.*, "[t]he underlying conduct was constitutionally immune from punishment." *Id.* ¶ 39. The court thus stated, "Had our analysis in *McFadden* taken into account the distinction between a prior conviction resulting from a constitutionally deficient procedure and one based on a facially

unconstitutional statute, the approach we took in that case would have been different. It is important that we acknowledge that now." *Id.* ¶ 76.

¶ 31 Like in *N.G.*, the facts of *McFadden* are distinguishable because the record shows that defendant's AUUW conviction was definitely based on the unconstitutional statute. Defendant's conviction for UUWF cannot stand.

¶ 32 B. Preliminary *Krankel* Inquiry

¶ 33 Next, defendant contends that the court erred in failing to appoint counsel and advance his claims of ineffective assistance of counsel to a full *Krankel* hearing. Specifically, defendant contends that the court should have found possible neglect of the case based on counsel's failure to (1) move to suppress the statements he made to Ross, (2) file motions *in limine* to bar introduction of the hooded sweatshirt, ammunition, and letters found at the apartment, and (3) "enforce" its motion for substitution of judge, seeking to bar Judge Alessio-Policandriotes.

¶ 34 Through *People v. Krankel*, 102 Ill. 2d 181 (1984), and its progeny, our supreme court has developed a procedural framework for the resolution of *pro se* posttrial claims of ineffective assistance of counsel. Where a defendant makes a posttrial claim of ineffective assistance of counsel, the circuit court must conduct a preliminary inquiry into those claims. *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003). If, after this preliminary inquiry, the circuit court "determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion." *Id.* at 78. If the court instead determines that there has been "possible neglect of the case," it must appoint new counsel to represent the defendant at a full hearing on his claims on ineffective assistance. *Id.*

¶ 35 A court's determination that a defendant's claim does not demonstrate a possible neglect of the case will only be reversed where that decision is manifestly erroneous. *E.g.*, *People v.*

- 17 -

*Robinson*, 2017 IL App (1st) 161595, ¶ 90. "Manifest error is error which is ' "clearly evident, plain, and indisputable." ' " *People v. Morgan*, 212 Ill. 2d 148, 155 (2004) (quoting *People v. Johnson*, 206 Ill. 2d 348, 360 (2002), quoting *People v. Ruiz*, 177 Ill. 2d 368, 384-85 (1997)).

¶ 36        First, defendant states in his brief, that he was interviewed by a detective "beginning at 2:41 pm on December 6, 2014, and the interview ended when defendant requested counsel at 3:14 pm ***. After the interview, and after defendant had been charged, officer Ross, who had been a detective in December 2014, processed defendant at the Joliet Police Department." Defendant contends that, because defendant requested counsel, all subsequent communications had to be suppressed. However, the record does not actually show that the booking process and conversation with Ross happened *after* defendant requested counsel. When asked when he processed defendant, Ross stated, "I can't give you an exact time. It was sometime in the afternoon." Ross stated to defendant, "that's what you told the detectives upstairs, that you guys didn't have anything to do with it." However, this does not make it indisputable that the interview in which defendant had requested counsel occurred prior to his interaction with Ross. The conversation and booking could have taken place before the interview; defendant does not cite to anything in the record to the contrary. Thus, there is a plausible reason why counsel did not raise this issue, and we cannot say that it was indisputable that defendant demonstrated possible neglect.

¶ 37        Second, defendant argues that counsel should have moved to bar introduction of the letters, hooded sweatshirt, and ammunition because it was not relevant. "Evidence is relevant when it (1) renders a matter of consequence more or less probable or (2) tends to prove a fact in controversy." *People v. Pelo*, 404 Ill. App. 3d 839, 864 (2010). Further, evidence is relevant if it can be connected both to the defendant and to the crime. *People v. Jones*, 22 Ill. 2d 592, 599

(1961). Defense counsel objected to the introduction of the letters. While defendant on appeal argues that counsel only objected on chain of custody grounds, the court considered whether the letters should be introduced as a whole, stating:

> "These are billing statements that are purported to be for [defendant], and each of them consistently indicating his address of 301 North Bluff Street, Apartment 307, Joliet, Illinois. Indicating that with, apparently, Provena St. Joe's Medical Center and the Secretary of State, that is the address in which he expects to receive and hopes to receive mail placed in the U.S. mail. And I'll accept that for what they are."

Defendant does not argue that there was any evidence that counsel should have presented to show that defendant did not live at that apartment. Considering the fact that the letters were official documents and were dated within two months of the crime, they were relevant to show that defendant lived in that apartment at that time. Moreover, the record showed that there was some indication that the perpetrator wore a black hooded sweatshirt, which was found at defendant's apartment. The ammunition found was also the same caliber and the same brands as were found in the gun that was determined to be the weapon used to shoot Johnny and Ledontia. Thus, all of this evidence was undoubtedly relevant, and we cannot say that it was manifest error for the court to find that defendant did not show possible neglect of his case.

¶ 38    Third, defendant argues that "[c]ounsel's motion to substitute Judge [Alessio-]Policandriotes was absolute and automatic. [Citation.] Yet, counsel did nothing to obtain the relief he originally sought. By failing to ask the court to enforce, or even rule on paragraph five of the motion, defense counsel abandoned this portion of the motion." At the outset, we note that defendant never actually stated in his motion for a new trial or during the *Krankel* inquiry that he

had wanted to substitute Judge Alessio-Policandriotes. At the *Krankel* inquiry, the court asked defendant if his motion for substitution of judge had been heard, and defendant agreed that it had been. Moreover, neither defendant nor counsel ever mentioned substituting Judge Alessio-Policandriotes. There was ample discussion when it was first assigned to her courtroom regarding the procedure by which it was assigned to her. Defendant and counsel had more than enough time to raise the issue if they wanted to. In fact, the only indication on the record that defendant sought to substitute Judge Alessio-Policandriotes was in a motion filed on June 16, 2016. However, the record shows that on that day two motions for substitution of judge were filed. The first motion named Judge Jones and Judge Alessio-Policandriotes; the second motion solely named Judge Jones. Defense counsel could have meant the second motion to supersede the first. As defendant states, "counsel apparently did not know that he had moved to substitute Judge [Alessio-]Policandriotes." That motion could have been entered in error. We cannot say that the court's finding was " ' "clearly evident, plain, and indisputable." ' " *Morgan*, 212 Ill. 2d at 155 (quoting *Johnson*, 206 Ill. 2d at 360, quoting *Ruiz*, 177 Ill. 2d at 384-85).

¶ 39                                    C. Summary

¶ 40         In sum, we find that defendant's previous conviction for AUUW was void *ab initio* and vacate his conviction. Because defendant's UUWF conviction was predicated on this void conviction, we reverse the finding of guilt for UUWF. While we affirm defendant's other convictions, we remand them for resentencing because it is unclear how the court considered the AUUW conviction during sentencing. See *People v. Bourke*, 96 Ill. 2d 327, 332 (1983) ("Where the reviewing court is unable to determine the weight given to an improperly considered factor, the cause must be remanded for resentencing."). The State certainly argued that the court should consider defendant's AUUW conviction at sentencing. Moreover, we find that the court's

- 20 -

determination that defendant's ineffective assistance of counsel claims did not show possible neglect was not manifestly erroneous.

¶ 41                                    III. CONCLUSION

¶ 42            For the foregoing reasons, we affirm in part, reverse in part, and remand the judgment of the circuit court of Will County.

¶ 43            Affirmed in part and reversed in part; cause remanded.

**No. 3-17-0168**

| | |
|---|---|
| **Cite as:** | *People v. Alexander*, 2019 IL App (3d) 170168 |
| **Decision Under Review:** | Appeal from the Circuit Court of Will County, No. 14-CF-2407; the Hon. Carla Alessio-Policandriotes, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Peter A. Carusona, and Bryon Kohut, of State Appellate Defender's Office, of Ottawa, for appellant. |
| **Attorneys for Appellee:** | James W. Glasgow, State's Attorney, of Joliet (Patrick Delfino, Thomas D. Arado, and Jasmine D. Morton, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |