# Illinois Official Reports

## Appellate Court

---

### *People v. Lerma*, 2021 IL App (1st) 181480

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EDUARDO LERMA, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>No. 1-18-1480 |
| Filed<br>Rehearing denied | June 4, 2021<br>June 25, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-9899; the Hon. Timothy J. Joyce, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Jennifer L. Bontrager, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Janet C. Mahoney, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion.<br>Presiding Justice Mikva and Justice Oden Johnson concurred in the judgment and opinion. |

**OPINION**

¶ 1        Following a bench trial, defendant, Eduardo Lerma, was convicted of first degree murder by personally discharging a firearm proximately causing death and sentenced to 45 years' imprisonment. On appeal, he contends that the evidence was insufficient to convict him beyond a reasonable doubt, as it consisted of an unreliable cross-racial identification made under difficult circumstances and an unbelievable dying declaration. For the reasons stated below, we affirm.

¶ 2                                    I. JURISDICTION

¶ 3        On January 5, 2018, the trial court found defendant guilty of first degree murder. The court sentenced him to 45 years' imprisonment on June 19, 2018, and he filed his notice of appeal the next day. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. Mar. 12, 2021) governing appeals from a final judgment of conviction in a criminal case.

¶ 4                                    II. BACKGROUND

¶ 5        Defendant was charged in relevant part with first degree murder for killing Jason Gill on or about May 3, 2008, by personally discharging a firearm proximately causing death.

¶ 6        Defendant was convicted following a 2012 jury trial. However, this court reversed and remanded for a new trial on the basis that the trial court did not properly consider whether to admit expert testimony on the subject of eyewitness identifications. *People v. Lerma*, 2014 IL App (1st) 121880. The supreme court affirmed this court's judgment. *People v. Lerma*, 2016 IL 118496.

¶ 7        Following remand, defendant elected a bench trial and waived his right to a jury trial.

¶ 8                                    A. State's Trial Evidence
¶ 9                                    1. Lydia Clark

¶ 10       Lydia Clark testified that she was a friend of Gill's sister and frequently visited her home in 2008, including spending weekend nights there. While she had never spoken with defendant nor seen him at Gill's home, she had seen him on a porch across the street from Gill's home "multiple times" before the shooting. At the time, she knew him as Lucky and did not know his name.

¶ 11       On the night in question, Gill and Clark were sitting on the front porch of Gill's home waiting for Gill's girlfriend to arrive. It was nighttime, and the streetlights were lit but the porch light of Gill's home was not. At about 11:20 p.m., nobody else was near Clark and Gill when defendant walked toward Gill's home, wearing a "hoodie" with the hood down, with a black gun in his hand pointed toward Clark and Gill. Defendant said nothing before firing multiple shots at Gill and Clark. He was standing on the sidewalk when he fired, and a mark that Clark placed on a photograph to indicate where he stood was in front of the house next to Gill's home between two gates at the corners of that property.

¶ 12       Gill covered Clark with his body as they fell to the porch. Clark was not shot, but Gill was bleeding. Clark dragged him inside his home, as he could not walk, and called 911. Gill was

gasping for breath. Inside, Gill's father, William Johnson (William), came into the front room from upstairs and asked who had shot Gill. Gill was able to speak at that point, though not loudly, and Clark heard Gill reply that Lucky shot him. Clark was already calling 911 when William came downstairs. When police arrived, Clark told them that Lucky had shot Gill. She said so because she saw defendant shoot Gill, not because she heard what Gill said to William.

¶ 13    Clark searched the neighborhood with police, also looking at photographs on a police computer, but did not see defendant that night in person or the photographs. About two hours after the shooting, Clark went to the police station and viewed an array of six photographs, from which she identified a photograph of defendant as the shooter. A day later, she went again to the police station and identified defendant in a showup; that is, police showed defendant by himself rather than with a lineup of similar persons. Less than a week after the shooting, Clark testified before the grand jury and identified defendant from a photograph as the shooter.

¶ 14    On cross-examination, Clark denied having seen defendant only once or twice before the shooting but acknowledged testifying before the grand jury that she saw Lucky "once or twice" before the shooting. She reiterated that the street was empty but for herself and Gill when defendant approached and said nothing before shooting. Gill also said nothing to defendant. The shooting happened at night, and there were streetlights, but there was no porch light on Gill's home. Defendant was standing on the sidewalk north of Gill's home when he fired, in the middle of that property. When asked if she recalled testifying that defendant was standing in the middle of the gate of the northern house, she replied that she meant the middle of that property. The house to the north of Gill's home was abandoned but not boarded up, she did not recall testifying in the first trial that the house was boarded up, and she acknowledged that a crime-scene photograph showed the house in question was boarded up. There was an unlit empty lot to the south of Gill's home. Clark reiterated that she dragged Gill into his home, and she did not recall telling police that night that Gill stumbled into his home after the shooting.

¶ 15    Clark was calling 911 as William came downstairs, so he was there for the call. While she was on the 911 call, William asked Gill who shot him. He was speaking to Gill in a normal tone, but she was focusing on the 911 call. Clark and William were both standing next to Gill, with Clark by Gill's feet, when he told William that Lucky shot him. She did not give the cellphone to William to speak to the 911 operator. When the recording of her 911 call was played, she acknowledged hearing William speaking in the background and at points much louder when he was nearer to her cellphone. Gill was able to speak to the responding officers, but Clark stepped out of their way and was not nearby. When asked if she had testified in the first trial that Gill was unable to speak by then, she explained that his breathing was labored and his voice was weak but he was able to answer police questions.

¶ 16    Clark was not on the porch when police arrived at Gill's home that night. The responding officers asked her questions at the scene but not immediately upon arrival. She could not recall if the officers asked for the shooter's height or weight, and she did not recall testifying in the first trial that she could not estimate his height or weight. She recalled that the officers asked her for a description of the shooter and she described him to the best of her ability. She did not recall telling officers that the shooter was Hispanic, as "I am not able to show or give anyone's ethnicity. I was asked a description of the shooter and that's what I gave." She told officers what happened that night and, later when they asked if she had seen the shooter before, told them that she had seen him across the street. She did not recall telling officers at the scene that Lucky or the shooter had "feuded" with Gill's family in the days before the shooting, nor did

- 3 -

she recall testifying in the first trial that she mentioned the "feud" to the responding officers. She did not recall having a discussion with Detective Michael Hughes about what kind of gun the shooter used, nor telling Hughes that the shooter's hood was up, but recalled telling Hughes that his face was not covered. Before she identified defendant from the photographic array, she looked at multiple photographs at the police station but could not recall if she saw defendant among them.

¶ 17    On redirect examination, Clark testified that the 911 recording did not record everything said at her end of the call because her call was passed between police and fire operators as she was discussing Gill being shot but also his medical condition. She acknowledged that a crime scene photograph depicted multiple lit streetlights on Gill's block. She had no difficulty seeing defendant's face during the incident. On recross examination, she acknowledged testifying in the first trial after listening to the 911 recording that what she heard was a true and accurate recording. On further redirect, she reiterated that portions of what she said and what Gill said were not on the 911 recording. On further recross, she testified that the 911 recording did not include the entire exchange between Gill and William.

¶ 18    Upon the court's examination, Clark could not recall the description she gave of the shooter to the responding officers because police showed her photographs on a computer very shortly thereafter, but she recalled saying that the shooter's face was not covered, he wore a black "hoodie," and he was called Lucky. When she testified in the first trial that the 911 recording was accurate, she meant that the portions she heard were correct, not that they were complete. Due to the transfers during the call, the recording was not complete. Gill told William that Lucky shot him shortly after Clark dragged Gill inside and William came downstairs.

¶ 19                                   2. The Johnsons

¶ 20    Gill's father, William, testified[1] that he was upstairs in his home at about 11:20 p.m. on the night in question when he heard at least two or three gunshots in front of his home, followed by Clark screaming that Gill had been shot. William ran downstairs and saw Gill lying on the floor inside the home. He asked Gill if he had been shot, and Gill said that Lucky shot him. William knew Lucky from the neighborhood and, at trial, identified defendant as Lucky.

¶ 21    On cross-examination, William testified that, at the time of the incident, it was night but not so dark that "you don't know a person." There was no porch or other exterior light on his home, and the lot south of his home was empty, but the rear of the empty lot had one or more lights lit for parking cars, and William denied that the house to the north of his home was abandoned. There were bullet holes in the front of William's home, but they were from before the night in question. About a week before the shooting of Gill, defendant was in a fight with Mekyell Bynum, William's grandson and Gill's nephew. William had thought the matter was "over" once the fight was broken up because defendant and William's family knew each other. William did not notice if defendant seemed angry after the fight, but he saw defendant in the neighborhood nearly every day and they had no problems to William's knowledge.

¶ 22    William told officers at the scene on the night of the shooting that defendant and Bynum had fought and told Sergeant Calvin Williams that Gill had identified defendant as his shooter.

_____

[1]William testified at the first trial but died before the second trial, and the court admitted the transcript of his earlier trial testimony as evidence in the instant trial. The same judge presided over both trials.

- 4 -

When Gill said that, William was next to him. William told Clark to call 911, but he could not recall if Clark was on the call when Gill identified defendant. William was talking to Gill rather than the 911 operator, but he could hear the 911 operator. When the 911 recording was played at trial, William recognized his voice, including that it "might have been" him saying that Gill could not speak. William explained that he was yelling to Clark at the time rather that speaking into the telephone himself, and he was confused and distraught when he said that Gill could not speak. While Gill, Clark, and William were alone inside the home during the call, several people were just outside on the porch.

¶ 23 On redirect examination, William testified that he was upstairs when he heard the shots and did not see the shooting.

¶ 24 Gill's mother, Delma Johnson, testified that she knew defendant as Lucky and did not know him by any other name. She saw defendant every weekend, as he and Gill were friends for years, and he often spent time in Gill's home, including eating dinner and sleeping there. About a week before Gill's death, defendant and Bynum had an argument, but it ended when Bynum walked away from defendant and defendant did not follow him. On cross-examination, she testified that the house north of hers was abandoned but not boarded up in May 2008. Nobody was injured or showed a weapon during the argument between defendant and Bynum.

¶ 25 3. Police and Forensics

¶ 26 Officer Eliel Roa testified that he and Officer John Thompson spoke to defendant on the same block as Gill's home at about 7 a.m. on May 3, 2008. Defendant identified himself and was not arrested.

¶ 27 Officer John Layne testified that he and another officer were patrolling on the night of May 3, 2008, when they heard gunshots at about 11:20 p.m. They were looking for the source of the gunshots when they were told by radio to go to a particular home. They arrived there within a minute and were the first officers there. Inside the front door, a distraught Clark told them that "Lucky shot him," and Layne then saw Gill on the floor. He was making gurgling noises but was unable to speak. William was standing next to Gill and did not acknowledge the officers as his focus was on Gill. More officers arrived, and Layne stepped away to give room for the paramedics. He later spoke with Clark, who was in shock and less than fully coherent but able to answer some of his questions. She reiterated that Lucky shot Gill, describing Lucky as a Hispanic man between 23 and 28 years old from across the street. She also said that "they had been arguing back and forth" and Lucky walked up and shot Gill, and she pointed to a location on the sidewalk north of Gill's home. All the information Layne gathered at the scene was from Clark.

¶ 28 On cross-examination, Layne testified that Clark was on the porch and Gill was on the floor between the vestibule and living room when he arrived. William was kneeling next to Gill trying to get him to speak, but he could not speak and was not moving. When Layne later spoke with Clark, she answered some but not all his questions, including not giving the shooter's height, weight, or eye color or describing the shooter's hair when asked. Layne's report did not describe Clark as hysterical or having difficulty communicating. Clark said that Gill stumbled inside his home after being shot, then fell down. She mentioned a feud between the shooter and Gill's family for the previous couple of days, but Layne's report was unclear whether it was a fight or argument. His report also did not mention that Clark had pointed to where the shooter stood when he fired. Layne could not recall if the house north of Gill's home

was boarded up on the night of the shooting. He and his partner did not take Clark to the police station or show her photographs while in a police vehicle with her.

¶ 29    Upon the court's examination, Layne testified to being uncertain whether Clark was already on the porch when he arrived or had stepped out onto the porch then.

¶ 30    Detective James LasCola testified that he was at the shooting scene on the night of the shooting. The streetlights were working, and he was able to see. While he used a flashlight that night to examine the ground for evidence, he could see the ground without it. When shown a photograph of the scene, he testified that the scene was "much brighter" than the photograph showed. He found no firearm evidence at the scene. While he saw bullet holes in the front of Gill's home, he learned that they were not from Gill's shooting. He did not investigate the earlier shooting. The lot next to Gill's home was empty, but he denied that the house on the other side of Gill's home was abandoned. An abandoned and boarded-up house was further down the block. However, he acknowledged that the house north of Gill's home was boarded up in a photograph.

¶ 31    LasCola spoke with Clark, who said she saw the shooting of Gill, so he had officers take her to the police station but did not interview her himself. To his knowledge, Clark was not shown various random photographs, other than a photographic array, nor a single photograph of defendant. Later, after defendant was arrested, LasCola arranged for Clark to return to the police station. While LasCola did not see or speak with defendant, a report he prepared based on discussions with other officers reflected that defendant had a scar on the right side of his face. However, he did not see a scar on defendant at trial nor when shown a photograph of defendant.

¶ 32    Detective Thomas Benoit testified that he and another detective prepared a photographic array and showed it to Clark on May 4, 2008. One of the photographs in the array was defendant, at least partially because the suspected shooter was called Lucky and police records showed that to be defendant's nickname. When shown the array, Clark identified defendant's photograph as depicting the shooter. Benoit then issued an investigative alert for defendant to be arrested. On cross-examination, Benoit testified that the photographs in the array other than defendant's were chosen by computer based on parameters rather than being individually selected by the detectives. The purpose of the investigative alert was to have defendant available for further investigation. When asked if defendant should have been placed in a lineup after his arrest, Benoit replied that he "couldn't say yes or no." To his knowledge, Clark was not shown an image of defendant before the photographic array.

¶ 33    Sergeant Jose Lopez testified that he and other officers arrested defendant on May 4, 2008, pursuant to the investigative alert. When defendant was being processed at the police station, Lopez heard him give his nickname as Lucky. Defendant had a scar on his face, but it was not prominent. However, the arrest report referred to his scar as a long scar along the right side of his face. At trial, Lopez testified that he did not see a scar on defendant's face.

¶ 34    Detective John Halloran testified that he spoke on May 5, 2008, at the police station with Clark, who said she witnessed the shooting of Gill. Clark said that she knew defendant, as Lucky, from the neighborhood of Gill's home and his acquaintance with Gill's family. Halloran conducted a showup whereby defendant alone was shown to Clark, and she identified him without hesitation as the shooter. Halloran explained that a lineup is not necessary when a witness knows the offender. While he had asked Clark if she knew the shooter, he did not

ask her to describe the shooter. To his knowledge, Clark was not shown an image of defendant other than the photographic array.

¶ 35    The physician who performed Gill's autopsy testified that he had a gunshot wound to the right side of his upper chest that passed through his right lung and exited the body through his lower back. The downward trajectory could be explained by Gill bending over to cover another person. Gill had another gunshot wound to his buttocks leading to a bullet embedded in the artery that supplies blood to the intestines. He also had abrasions to his skin consistent with either falling or being dragged across a wood floor. He could have been conscious "for a little while after" receiving such wounds. The parties stipulated that the bullet found in Gill's body was inventoried. A forensic scientist testified that he examined the bullet and found it to be revolver ammunition.

¶ 36    The court denied the defense motion for a directed finding.

¶ 37                            B. Defense Evidence
¶ 38                              1. Defendant
¶ 39    Defendant testified that he was familiar with the block in question in 2008 because he had lived there in 2001 and still had friends there. He was friends with Gill, his brother Taurhern Gill (Taurhern), and his parents for years, though he knew Gill as Dub rather than his name. He was unaware of the shooting of Gill on May 3, 2008, before his May 4 arrest when police questioned him about the shooting. He was home on the night of May 3 from about 9 p.m. onwards. He had a fight with Bynum, a relative of Gill, followed by Gill's parents verbally confronting him, about 7 to 10 days before the shooting. However, he had no disputes with Gill himself except for a minor dispute over "a couple of dollars" of change in the summer of 2007. He denied shooting at Gill in 2007 or on the night in question.

¶ 40    On cross-examination, defendant testified that his nickname on the block in question was Lucky or Eddie, that Gill and his family called him Lucky, and that he would "hang out" on a porch across from Gill's home. He never had any issues with poor streetlighting during his visits. He was close enough friends with Gill that on one occasion Gill invited him into his home, and defendant spent half a night in his room. He was on Gill's block at about 7 a.m. on the day of the shooting when a police officer spoke with him. The officer offered him a ride home, but he declined and remained there, and the officer did not arrest him. He admitted telling the officer that he lived in a certain area when he actually lived elsewhere but explained that he showed the officer his identification, which had the address he gave the officer. He did not recall telling the officer his nickname but acknowledged that the officer's notes gave his nickname as Lucky.

¶ 41    After the interaction with police, defendant was on Gill's block until he went home around 9 p.m., and he was home alone until the next day. After his arrest the next day, when police detectives were questioning him about Gill's shooting, he could not recall if he gave his nickname as Eddie or Lucky. After being shown video of his postarrest interview, he admitted that he had said just Eddie, not Lucky. He also acknowledged not mentioning in the interview his fight with Bynum and argument with Gill's family about a week before the shooting, explaining that it was a "push and shove" and not "a big deal." Once detectives confronted him with that incident, he repeatedly referred to Bynum attacking him because he had. Defendant had known that Bynum was Gill's relative but not his brother, despite a detective referring to Bynum as Gill's brother.

- 7 -

¶ 42 On redirect examination, defendant testified that, in his postarrest questioning, he did not deny that his nickname was Lucky or that he had a fight with Bynum. He had no arguments with anyone in Gill's family or on Gill's block after the incident with Bynum.

¶ 43                                    2. Taurhern Gill

¶ 44 Gill's brother, Taurhern, testified that, an hour or two before the shooting of Gill, he saw Salvador Rojas, who lived on the same block as Gill and Taurhern, with a gun in hand in the alley behind Gill and Taurhern's home. A few days after the shooting, police showed Taurhern a photographic array from which he identified Rojas. He knew both Rojas and defendant, who he knew as Lucky, from the neighborhood. While defendant and Rojas were both light-complected Hispanic men who "hung out" together across from Taurhern's home, he did not think they looked alike and had no trouble telling them apart.

¶ 45 The parties stipulated to Taurhern's prior convictions for possession of a stolen motor vehicle, distributing a lookalike substance, and retail theft.

¶ 46                                 3. Police and Forensics

¶ 47 The parties stipulated that a paramedic who treated Gill at about 11:27 p.m. would testify that Gill was unconscious and unresponsive, his eyes would not open, and he was not moving.

¶ 48 Police detective Hughes testified that, on the day after the shooting, Clark described being on the porch with Gill when a man with his hood up fired a black gun. Clark named Lucky as the shooter, said he was not her friend but she knew him for "a couple of months," and described him as a white man in his twenties, about 160 pounds, and between 5 feet, 6 inches, and 5 feet, 9 inches, tall. Hughes showed her a revolver and a semi-automatic pistol, and she said the latter more closely resembled the shooter's gun. Hughes did not recall Clark saying that Gill identified his shooter. His report did not refer to such a statement by Clark, and it would have reflected such a remark had she made it.

¶ 49 Sergeant Williams testified to interviewing William on the night of the shooting at the scene. He mentioned hearing the shots and coming downstairs to see Gill, referred to the argument between defendant and Bynum, and recalled seeing defendant "hanging out" on his block on the day of the shooting. However, he did not mention Gill identifying defendant or Lucky as his shooter. Detective LasCola also interviewed William, but Sergeant Williams was unaware of any police report stating that William mentioned Gill identifying his shooter.

¶ 50 Detective Joaquin Mendoza testified that he showed a photographic array to Taurhern, from which he identified Rojas as the person Taurhern saw about two hours before the shooting. Rojas was 190 pounds and 5 feet, 10 inches, tall according to police records. No investigative alert was issued for Rojas.

¶ 51 The parties stipulated to crime-scene photographs and the 911 recording. In the recording, Clark speaks to the operator first. William can be heard in the background learning from Clark that Gill was shot and where he was. The operator transferred the call to the fire department, and William interacted with that operator. The call ends with William saying that police had arrived.

¶ 52 The parties stipulated that police had no record of any identification procedure performed by Clark beyond the photographic array and showup. There was no record of Clark being shown photographs on a police computer in a police vehicle or a photograph of defendant at

the police station nor any record of officers driving Clark through the neighborhood in search of the shooter.

¶ 53                                4. Visibility

¶ 54        The parties stipulated that (1) there were three 20-foot-tall streetlights on the block in question, all on the opposite side of the street from Gill's home, and (2) an astronomer would testify that the moon was not visible in the sky over Chicago on the night of May 3, 2008.

¶ 55        Rosa Silva, investigator for defense counsel, testified to trying to interview Clark in 2010 but Clark refused. Except that the weather was cold, Silva could not specify when in 2010 the attempted interview occurred, and she had no report to refresh her recollection. On cross-examination, she testified that she had also visited the scene of the shooting to take photographs and measurements, during daytime and not at night, and made a report of that visit. The porch where Gill was shot was at least five feet above ground, and someone on the porch would be looking down on where the shooter stood with nothing blocking his or her view. On redirect examination, she testified that she wrote a report when a witness gave a statement but did not write a report because Clark gave no statement.

¶ 56        Steven Ramsey, another investigator for defense counsel, testified that he went to the shooting scene in May 2016 to take photographs and measurements. From the northern of two gates in front of the house north of Gill's house to the nearest corner of Gill's porch was 24 to 27 feet (as measured to the north edge of the gate and its middle, respectively). He measured again in 2017, and it was 26 feet from the face of a person 5 feet, 10 inches, tall standing where the shooter stood to the nearest corner of Gill's porch and 27 feet from the face of a person 5 feet, 9 inches, tall on the same corner to the face of a person 5 feet, 10 inches, tall standing where the shooter stood. There were three streetlights on the block, all on the east side of the street, while Gill's home was on the west side. From where the shooter stood, the nearest streetlight was 63 feet away, the one south of it was 108 feet away, those two streetlights were 158 feet apart, and the nearest streetlight was 163 feet from the one north of it. While there was a tree north of Gill's home and one south of it in earlier photographs, the northern tree was gone by 2017.

¶ 57        On cross-examination, Ramsey testified that the view to where the shooter stood from the nearest corner of Gill's porch was not blocked. There were streetlights on the street in question outside the block in question, and he did not measure the distance to those streetlights.

¶ 58        On redirect examination, Ramsey testified that when he stood where the shooter stood, he could not see the nearest streetlight on the block south of Gill's block nor the nearest streetlight north of a viaduct at the north end of Gill's block.

¶ 59        On recross examination, Ramsey testified that his report did not mention any streetlights other than the three on Gill's block. He could not answer if the first streetlight north of the viaduct was taller than the viaduct. When he was asked if "[s]eeing the pole doesn't limit the light from illuminating down from the streetlight," he replied "[d]epends on if the streetlight is working."

¶ 60        On redirect examination, Ramsey testified that his report did mention being unable to see any other streetlights when standing where the shooter stood. He did not compare the height of the viaduct to the height of the streetlights.

¶ 61                                    5. Expert

¶ 62        Dr. Jeffrey Loftus testified as an expert on memory, perception, and experimental psychology. He testified to a theory of memory that a person's experience of an event is initially "fairly fragmentary" and the brain reorganizes, reconstructs, and organizes information to make a narrative, with errors possibly introduced as the conscious experience becomes memory. An event "contains such a vast amount of information that it would be impossible *** to get even a small portion of it." Also, many factors can diminish the accuracy of the information acquired, including time, darkness, distance, and attention.

¶ 63        Considering darkness in particular, Loftus explained that, even after a person's vision has adjusted to darkness, low-light vision is not in color and resolution of details is "far lower." Over distance, darkness reduces the ability to perceive features by a factor of three; that is, details visible 300 feet away in daylight are only visible 100 feet away in darkness.

¶ 64        Pre-event information and expectations and postevent information can unconsciously alter memory of the conscious experience so that a person may not be able to distinguish his or her conscious experience of the event from other information in his or her memory of the event. The resulting memory will be strong and detailed but may be partially false. For example, in experiments where subjects witnessed a simulated crime and were shown lineups that did not include the simulated perpetrator so that any resulting identifications were erroneous, subjects who made an identification and were told that it was correct were more confident in their identification. They also reinforced their confidence by misremembering the circumstances under which they saw the suspect as being more favorable than they actually were. Because pre-event and postevent information are incorporated unconsciously, a person may be confident of a false identification, and confidence is not a reliable factor for determining whether an identification is reliable.

¶ 65        High-stress situations can cause poorer memories both because high stress negatively affects mental functioning including creating memories and because discussion and examination of the high-stress event creates a greater opportunity to incorporate postevent information, so that memory of a high-stress event can be particularly vivid but also particularly subject to error. Attention is also highly relevant to forming memories, especially as people are always doing more than one thing at a time (even if just standing or holding something) and being "bombarded" with information through their senses that must be filtered for relevancy to what the person is doing. Experiments have shown that a person must focus on another person's appearance to remember what he or she looked like later.

¶ 66        Loftus discussed weapon focus, the phenomenon of witnesses focusing on a weapon whenever a weapon is in a scene instead of focusing on the appearance of the person holding the weapon. Thus, a person is less likely to be able to identify a person if the person was holding a weapon than some other object.

¶ 67        Loftus opined regarding cross-racial identifications that people are statistically less capable of identifying and recognizing people of other races. As one may expect, studies have shown that disguised or concealed faces are less recognizable than unconcealed faces. Human brains perceive faces differently than other objects because the facial fusiform area of the brain processes faces in a configural manner; that is, processing all the features at once instead of one at a time as with other visual stimuli. Obscuring part of a face negatively affects this configural processing.

¶ 68    When asked if identifications by multiple witnesses are more reliable, Loftus explained that independent identifications would be more reliable, but identifications can lose independence when witnesses communicate and thus share postevent information, have the same pre-event information, or their identifications result from the same biased identification procedure.

¶ 69    When asked about identifying acquaintances as opposed to strangers, Loftus explained that identification of an acquaintance is quicker and easier because the brain compares the sensory input to a preexisting image of the person rather than constructing a new image. However, the usual sources of error, such as darkness and stress, can affect perception. Also, priming can occur; that is, past perception and experience can unconsciously influence the present conscious experience. Thus, faced with incomplete information from one's senses, one may incorporate pre-event information into the present conscious experience by inferring that a person one is seeing is an acquaintance who resembles the incomplete information available and then recalling this inferred recognition as a complete or vivid but false recognition.

¶ 70    Loftus did not provide an opinion on whether the eyewitnesses in this case made accurate identifications. However, an incident such as the fight or argument between Gill and Bynum is the kind of pre-event information that could serve as priming for an identification.

¶ 71    On cross-examination, Loftus reiterated that he was not opining on the identifications in this case, as he did not meet with any of the witnesses. A rapid identification, as was made here, is not necessarily a sign of an accurate identification because it could be affected by pre-event information. Similarly, the fact that a witness repeats their identification over the years demonstrates their confidence but not necessarily their accuracy. Loftus had no direct experience of the lighting conditions here. The studies and experiments he discussed on confidence in false identifications did not involve identifying persons known to the subjects, and the studies of cross-racial identifications he referenced did not address identification of acquaintances of another race.

¶ 72    Loftus acknowledged that a witness who described a weapon in detail would show that his or her focus was on the weapon for some time. Because Loftus did not know where the focus of the witnesses was, that would be one of the issues for the trier of fact to consider and determine. The effects of darkness would be less at shorter distances, and the witnesses here were less than 50 feet from the shooter. He was not opining that nobody can make an accurate identification in the dark under any circumstances. As to the effects of stress, different people have different tolerances for stress, which can affect their ability to recall. He was "not saying that no one could ever accurately identify someone that they witnessed fire a handgun."

¶ 73    On redirect examination, Loftus testified that while some of the information he used came from experiments, they were consistent with information from studying real-life instances of misidentification. A belief that one's identification was correct, which would increase one's confidence in the identification, could arise in various ways, only one of which is being told that the identification was correct. A person could be primed to recognize someone as an acquaintance by their recollection of the acquaintance's appearance.

¶ 74    Loftus would not opine as to the accuracy of a witness's identification but would offer an opinion as to its reliability. While he did not meet the witnesses here, he read the witness statements in the police reports and had enough information to opine on the witnesses' reliability. He was aware that the shooting occurred at night with only streetlights providing light. Streetlights "are problematical as a source of light for doing any kind of detailed visual

processing including looking at somebody's face and determining who they are." Firstly, they are designed to not be bright but merely sufficient to see where one is going, as light sufficient for reading could "blind" drivers. Secondly, they are often spaced far enough apart that only one streetlight is relevant to seeing an event, but a person seen under a single light will be illuminated in parts and shadowed in others. This effect would be greatly reduced if the light was directly behind the witness and greatly exacerbated if the light was directly behind the suspect.

¶ 75                                                    6. Miscellaneous

¶ 76         The parties stipulated to Gill's prior conviction for theft.

¶ 77         The parties also stipulated that Clark testified in the first trial that the first officers on the scene tried to speak with Gill but he was unable to talk, the house north of Gill's home was abandoned and boarded up, the shooter was standing in front of the gate of the house to the north when he fired, she told the responding officers that defendant had been feuding with Gill's family, she was unable to estimate the shooter's height or weight for the responding officers, and she had seen defendant "once or twice before" the shooting.

¶ 78                                                    C. Rebuttal Evidence

¶ 79         Officer Thompson testified that he spoke with defendant at about 7 a.m. on the day of the shooting when defendant was on a porch. He asked for defendant's identification, which defendant produced. He asked defendant for his nickname, and defendant replied that it was Lucky. He gave no other nicknames. Defendant also gave Thompson other information that would not be on his identification card, such as his employer and telephone number. On cross-examination, he testified that defendant was wearing a white and orange jacket. He did not arrest defendant.

¶ 80         Selected portions of a postarrest interview of defendant, in video and transcript form, were entered into evidence. After giving his name near the beginning of the interview, defendant gave his nickname as "[j]ust Eddie." After he had given his account of events, he was asked again for his nickname and replied "They call me Eddie some people call me Lucky."

¶ 81                                                    D. Decision and Judgment

¶ 82         Following closing arguments, the court found defendant guilty of first degree murder. The court found that there were no breaks in the 911 recording. It noted that Officer Layne testified to Clark identifying Lucky as the shooter essentially immediately. The court attributed Clark's testimony to searching the neighborhood for Lucky while looking at photographs, and the absence of a police record that happened, to "very dynamic" circumstances. The court noted the usual factors for evaluating an eyewitness identification and Dr. Loftus's testimony regarding the accuracy of identifications. Noting that defendant during interrogation first gave his nickname as Eddie and then as Lucky could support either the State's argument that defendant was hiding his nickname of Lucky out of consciousness of guilt or the defense argument that he freely stated his nickname was Lucky, which did not show consciousness of guilt. The defense argument was supported by Sergeant Lopez's evidence that defendant gave his nickname as Lucky upon arrest. In sum, defendant's interrogation did not prove him guilty.

¶ 83    The court expressly found Clark credible but noted that her accuracy or reliability rather than her credibility was at issue. Dr. Loftus's testimony established "legitimate factors that ought to be looked at in identification cases." However, the shooting of Gill took place too fast for Clark to become susceptible to focusing on the gun. While pre-event information can affect an identification, neither the dispute between defendant and Bynum nor the earlier matter of change between defendant and Gill seemed so serious that it would reshape Clark's perception. The fact that Clark answered Layne's questions quickly and gave coherent answers to some but not all his questions bore out that she was in shock and providing answers without forethought.

¶ 84    As to William, Clark corroborated his testimony that Gill identified his assailant as Lucky or defendant. The defense did "an excellent job" arguing that the conversation between Gill and William never occurred. There were no apparent breaks in the 911 recording, and Clark did not mention Gill's identification to Detective Hughes. However, there was also no evidence that Hughes or another officer asked Clark or William if Gill said anything. It was highly plausible that William would have asked Gill upon coming downstairs what happened and who shot him, to the point that the court had no doubt that William asked Gill such questions. However, while the 911 recording was continuous, it not only did not pick up Gill replying to William's questions, it did not pick up William asking them. Thus, the court believed William and Clark that Gill identified Lucky as the shooter despite the absence of such a statement on the recording.

¶ 85    Lastly, the court acknowledged the defense's argument that the light was inadequate at the time of the shooting but found that there was no reason for it to conclude that Clark and Gill were incapable of seeing the shooter sufficiently to identify him.

¶ 86    Defendant's posttrial motion as amended argued in detail that the trial evidence was insufficient to convict beyond a reasonable doubt. The court denied the motion. Following a sentencing hearing, the court sentenced defendant to 45 years' imprisonment.

¶ 87                                    III. ANALYSIS

¶ 88    On appeal, defendant contends that the evidence was insufficient to convict him beyond a reasonable doubt, as it consisted of Clark's unreliable cross-racial identification made under difficult circumstances and Gill's unbelievable dying declaration or excited utterance.

¶ 89    When the sufficiency of trial evidence is at issue, we must determine whether, taking the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *People v. Jackson*, 2020 IL 124112, ¶ 64. It is the responsibility of the trier of fact to weigh, resolve conflicts in, and draw reasonable inferences from the testimony and other evidence, and we will not retry a defendant nor substitute our judgment for the judgment of the trier of fact. *Id.* The trier of fact is not required to disregard inferences that flow normally from the evidence nor to seek all possible explanations consistent with innocence and elevate them to reasonable doubt. *Id.* ¶ 70. Similarly, the trier of fact need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances if the evidence as a whole satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt. *Id.* A conviction will be reversed only if the evidence is so unreasonable, improbable, or unsatisfactory that a reasonable doubt of the defendant's guilt remains. *Id.* ¶ 64.

¶ 90    It is axiomatic that a conviction may be properly based on a positive identification by even a single eyewitness with sufficient opportunity to observe. *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 22 (citing *In re M.W.*, 232 Ill. 2d 408, 435 (2009)). While we do not "rubber stamp" credibility determinations, the deference we accord the trier of fact means that "the circumstances that lead us to conclude that *no reasonable person* could have accepted a witness's testimony should naturally be few and far between." (Emphasis in original.) *Id.* ¶ 19. A trier of fact assesses the reliability of identification testimony in light of all the circumstances including the witness's (1) opportunity to view the offender at the time of the offense, (2) degree of attention at the time of the offense, (3) description of the offender, and (4) degree of certainty, as well as (5) the length of time between the offense and the identification. *Id.* ¶ 22 (citing *M.W.*, 232 Ill. 2d at 435). No single factor conclusively establishes the reliability of identification testimony. *Id.* For instance, the fact that a witness gave a general or imprecise description does not necessarily render his or her identification unreliable because a witness is not required to distinguish individual features of a suspect in making an identification. *Id.* ¶ 28. Instead, a positive identification can be sufficient based on the total impression made by the suspect's appearance. *Id.*

¶ 91    While our supreme court and this court have acknowledged studies and decisions that have called into question the reliability of eyewitness identifications, each case must be judged on its own facts against the touchstone of whether no reasonable trier of fact could have believed the eyewitness identifications when the evidence is taken in the light most favorable to the State. *Id.* ¶ 34. This court and the supreme court remanded for a new trial in this case because there was sufficient evidence to convict so that double jeopardy would not apply. *Lerma*, 2016 IL 118496, ¶ 35; *Lerma*, 2014 IL App (1st) 121880, ¶ 41. As this court has noted, " 'the scientific research is "probabilistic"—meaning that it cannot demonstrate that any specific witness is right or wrong, reliable or unreliable, in his or her identification.' " *Macklin*, 2019 IL App (1st) 161165, ¶ 21 (quoting *State v. Lawson*, 291 P.3d 673, 685 (Or. 2012)).

¶ 92    Here, taking the evidence in the light most favorable to the State as we must, we find that a reasonable trier of fact could find defendant guilty of first degree murder. We consider the threshold issue to be credibility, specifically the credibility of the testimony by William and Clark that Gill identified defendant, as Lucky, as his shooter before police and paramedics arrived and he was unable to speak. That issue in turn depends on the weight we give the 911 recording, which does not reflect Gill making such an identification. The trial court found that there were no gaps in the recording, but that does not preclude the possibility that Gill said Lucky shot him but the 911 recording did not pick it up due to the faintness of Gill's voice as he gasped for air and to the operator or Clark speaking in the foreground. Keeping in mind that the trial court heard Clark's testimony and found her credible, its finding that Gill told William that Lucky shot him does not strike us as so unreasonable, improbable, or unsatisfactory that a reasonable doubt of defendant's guilt remains.

¶ 93    The other key issue is the reliability of the identifications by Clark and Gill. Dr. Loftus's testimony established a reasonable possibility that, for various reasons, a credible witness could make an unreliable identification. He spoke to possibilities or probabilities, denying that his opinion was that nobody could make an accurate identification in the dark or when faced with a weapon. The court as trier of fact expressly considered the possibility raised by Dr. Loftus and rejected it. As stated above, we need not elevate reasonable possibilities rejected by the trier of fact to the level of reasonable doubt. Instead, we consider whether any rational

- 14 -

trier of fact could agree with the trier of fact's conclusions. We find that the trial court's conclusion that Clark's and Gill's identifications of defendant were reliable was one a rational trier of fact could reach.

¶ 94 Firstly, the weight of the evidence, including defendant's own testimony, was that defendant was frequently on Gill's block so that there was ample reason for Gill to be able to recognize him. While there was evidence that Clark said before trial that she saw defendant only once or twice before the shooting, she testified at trial that she saw defendant more than that, which was supported by her testimony that she frequently visited Gill's home, including staying overnight, as she was friends with Gill's sister, and thus had ample opportunity to see defendant.

¶ 95 It is also reasonable to conclude that Clark and Gill had a sufficient opportunity to see defendant to make their identifications. While the night of the shooting was moonless, there were working streetlights on the block. Moreover, the defense's measurements established that Gill and Clark saw the shooter from less than 30 feet away. The distance would be somewhat less if he was standing where Clark indicated at trial rather than in front of the northern neighbor's northern gate. Accepting Dr. Loftus's factor of three for nighttime *versus* daylight vision, recognizing someone, especially someone with whom one has some familiarity rather than a stranger, 90 feet away in daylight does not strike us as improbable. As to Clark and Gill's focus, Clark testified that she and Gill were waiting for his girlfriend when defendant approached, so it is reasonable to infer that at least part of their focus was away from the porch looking for someone approaching.

¶ 96 As to the possibility that Clark and Gill were primed by the incident between defendant and Bynum to think of defendant when faced with incomplete visual information, the evidence supports the court's finding that Gill's family and associates had considered the incident minor and "over" on the day it happened, about a week before the shooting, so that it was not prominent in the minds of Clark or Gill when they identified defendant within a few minutes of the shooting. Similarly, while there was evidence that Clark was presented with questionable identification procedures including a showup, she and Gill had identified Lucky or defendant well before any of those procedures occurred.

¶ 97 Lastly, we note that Clark's descriptions of the shooter were less than ideal, including not being able to estimate his height or weight for the responding officers. However, the proposition recognized by courts that an identification can be based on a general impression rather than particular details is supported by Dr. Loftus's testimony that the human brain processes faces configurally or as a whole.

¶ 98                                                        IV. CONCLUSION
¶ 99 Accordingly, the judgment of the circuit court is affirmed.

¶ 100 Affirmed.