NOTICE

Decision filed 02/05/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230602-U

NO. 5-23-0602

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Macon County. |
| | ) | |
| v. | ) | No. 20-CF-1169 |
| | ) | |
| DELAHN L. AMOS, | ) | Honorable |
| | ) | James R. Coryell, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE McHANEY delivered the judgment of the court.
Justices Moore and Boie concurred in the judgment.

**ORDER**

¶ 1  *Held*:  Where any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt and trial counsel was not ineffective, the defendant's convictions are affirmed.

¶ 2  On September 18, 2020, the defendant was charged with one count of attempted first degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2018)), one count of aggravated battery (*id.* § 12-3.05(e)(1)), one count of unlawful possession of weapons by felons (*id.* § 24-1.1(a)), and one count of aggravated unlawful use of a firearm (*id.* § 24-1.6(a)(1)(3)(C)). After a bench trial, the defendant was found guilty of attempted first degree murder, aggravated battery, and aggravated unlawful use of a firearm. The trial court merged the aggravated battery into the attempted first degree murder and sentenced the defendant to 40 years in the Illinois Department of Corrections

1

(IDOC) for attempted first degree murder and a consecutive 5-year IDOC sentence for aggravated unlawful use of a firearm, followed by 4 years of mandatory supervised release (MSR).

¶ 3                                    I. Background

¶ 4      The following evidence was adduced at the defendant's bench trial. We cite only those facts relevant to this disposition. Officer Charles Lane of the Decatur Police Department testified that, while on duty on August 27, 2020, at approximately 10 p.m., he and Officer Clayton Zilz heard several gunshots, a pause, and then several more gunshots. When arriving at the area of the gunshots, the officers had their windows down, and then heard a male voice calling for help. The officers found a male with gunshot wounds lying on the ground in the front yard area of 1185 North College Street. The victim was removed from the scene by ambulance and identified as Daniel Benjamin. Officer Zilz testified to the same events, also noting that no other person was located during the protective sweep after Benjamin was removed by ambulance.

¶ 5      Officer Malcom Livingston testified that he was dispatched to 1185 North College Street for a gunshot call. Upon arrival at the scene, he was assigned to follow the ambulance with the gunshot victim to the hospital to "try to get a statement from [Benjamin] as to what occurred." Officer Livingston spoke with Benjamin after he was initially treated and was given the names of two individuals: one named Dehlan (Benjamin did not know his last name) and someone nicknamed "six four." Officer Livingston tracked down the addresses of these two individuals and acquired information about a red Monte Carlo that was identified as the vehicle "Dehlan" drove. A photo lineup was generated, and Benajmin identified the defendant as the one who shot him.

¶ 6      Benjamin testified that he knew "six four," later identified to be codefendant Levron Hines, through Demetrius Maclin, who had been murdered the previous night, August 26, 2020. Benjamin had been working on a tattoo for Hines's wife. He testified that he met "Dehlan," the defendant,

in the spring of 2020 and identified him in the courtroom. When asked how he would characterize his relationship with the defendant, Benjamin stated, "Very good. We were close, I thought," and described the defendant as a friend.

¶ 7    On August 27, 2020, Benjamin was at the defendant's house in the area of Union and Packard Streets between 6 p.m. and 7 p.m. to return a tattoo gun to one of the defendant's friends. Benjamin then left the defendant's house and went to an individual's house he knows as "JD" who was living approximately four blocks away. He went to JD's house around 6:30 and then to Hines's house between 10 and 11 p.m., to finish his wife's tattoo. Benjamin rode a bike to Hines's house, and when he arrived, Hines asked him "to get in the car and take a ride with him back over to his other house." Hines's other house was "right around the corner from Union and Packard, probably like three blocks." When asked if Benjamin had cause for concern about being asked to go to another house with Hines, Benjamin stated, "No, not at the time. Like I said, these were my friends, so I didn't second guess what was about to happen. I didn't—the thought never came to my mind that this was going to happen, so I never thought nothing ill was going to befall on me." Benjamin testified that he had been to the house Hines took him to before and was familiar with the area.

¶ 8    When they arrived, there were a lot of people out front and around the house. Benjamin testified that Hines called the defendant and told him to come to the house where they were and stated that he, Benjamin, had killed Maclin. However, Benjamin said he began to "get a little antsy" when Hines called the defendant to come to the house but did not fear for his life at that point. As he and Hines were walking into the house, "Hines got a gun from one of them." Benjamin stated that he initially did not have any concerns about Hines having a gun because they were on "a drug selling block," and guns were normal for people to carry. Benjamin described the gun as "a pistol, black. I learned later it was a .40 cal High-Point."

3

¶ 9    Benjamin testified that the defendant pulled up in a red Monte Carlo and identified the vehicle in a photo shown to him by the State. When asked if he had seen the defendant driving the car before August 27, 2020, Benjamin replied that he had seen him driving that red Monte Carlo "[e]very day" and had ridden in it with the defendant once before. Benjamin stated that when the defendant got out of the red Monte Carlo, the defendant started "explaining what he thought was his accounts of the events the day before to [Hines]." Benjamin clarified that the "event" that he was referring to was that of Maclin's murder. The defendant had an AK-47 in his hand, and Benjamin described it as "all shiny and, like nice. It looked almost like a toy." When asked if he noticed anything else about the configuration of the gun, Benjamin stated, "No, I didn't really notice too much about the gun. Like I was more worried about now I have two people with guns surrounding me. That's where my mind was going to." When asked if he remembered what kind of stock the AK-47 had, Benjamin stated that "[i]t had a wooden stock."

¶ 10    While the defendant was speaking, the defendant said that Hines "kind of" stuck his pistol "in his waistband and then, like, walks over to me and, like sneakingly puts it under his arm kind of, and then he just pulled the trigger." The bullet struck him in the left arm and went through his rib. After he realized he had been shot, Benjamin tried to "back up and get up out of there. Like I was trying to explain, the only thing I kept asking is why. I never saw it coming." During this time, the defendant was trying to tell Benjamin that Benjamin "had something to do with [Maclin's] murder." As he was backing up, Benjamin also began to run and "ran over by a tree" on the opposite side of the street. As Benjamin was by the tree on the ground, the defendant shot the AK-47 "about 10 times." As he lay on the ground, the defendant shot him from "[p]robably 3 foot, 4 foot." He stated that he was struck "all over [his] lower back and legs."

4

¶ 11    Benjamin stated he "saw the defendant. He had tears in his eyes. He looked like he was in a position to where he didn't want to be doing what he was doing, but, I mean, he definitely—he was right there." At that point, the defendant started to walk away in the opposite direction, and Benjamin "got up and ran," but the AK-47 started going off again. Benjamin was running away and "ended up on the corner underneath of a bush when it was all said and done." While Benjamin was under the bush, the defendant and Hines "came back" looking for him and "even asked some guy that was, like, across the street where I went." He said the defendant and Hines had left the area when police arrived. Benjamin testified, "If that cop didn't pull up to that corner and put his lights underneath that bush, I would not be here today."

¶ 12    On cross-examination, Benjamin admitted he had previously written two "affidavits" stating that Hines was not actually involved in the shooting. These two "affidavits" were admitted into evidence. Benjamin stated he was forced to write these statements for Hines, they were not true, and the defendant's brother had even offered to pay Benjamin's bond if he agreed not to testify at trial. The trial court clarified that the admitted documents were not affidavits, as they were not sworn to, but they are just written statements that Benjamin made. Defense counsel repeatedly questioned Benjamin if he had consumed drugs the day of the shooting, which he denied. Benjamin stated, "I did none the whole day. You can check my levels, my hospital record"; however, he did admit that drugs were found in his possession on the day he was shot but continued to assert he did not consume them that day.

¶ 13    On recross-examination, Benjamin testified that he believed he was shot because Hines and the defendant thought Benjamin killed Maclin. Benjamin stated he did not have knowledge that the defendant was charged with Maclin's murder. The trial court took judicial notice of 20-CF-1170, which is the case in which the defendant is charged with Maclin's murder.

5

¶ 14    Next, Detective Jason Debort testified that he processed the crime scene. He collected a bag that belonged to Benjamin that contained tattoo equipment and 10 shell casings. The caliber of those casings were "7.62 and 39." The model of the ammunition that the casings noted on one of the casings "was TulAmmo, and the others were GECO." Detective Debort also took photos of a blood-like substance "both in the yard [where Benjamin had been lying] and the boulevard between the sidewalk and the street."

¶ 15    Detective John Danner then testified that a search warrant was executed at the defendant's residence. During that search, police located identifying documents and a rifle scope that attaches to a Picatinny rail on a rifle, which was located in one of the bedrooms on a pile of clothes. He also noted a red Monte Carlo parked in the side yard adjacent to the residence. Detective Brad Hall testified that he "ran the registration plate [of the red Monte Carlo] and it checked to a Shambreah Williams and knew that Delahn Amos and Shambreah had a mutual child together." After a warrant to search the vehicle was obtained, an "AK-47-style rifle" was located in the trunk. At the time of its discovery, the rifle had a 30-round magazine inserted and "a live round came out of the chamber, which would insinuate that the gun was loaded, ready to be fired." The manufacturer of the live ammunition ejected from the magazine was a GECO model with a caliber of 7.62 by 39.

¶ 16    Hali Carls-Miller testified that she is a forensic scientist with the Illinois State Police. She was certified as an expert in firearms identification and examination and testified that the 10 shell casings recovered from the scene were fired from the AK-47 found in the trunk of the red Monte Carlo. The State attempted to continue the trial due to an unavailable witness, stating that the witness would provide testimony that would "essentially" identify the defendant's profile on the firearm. The trial court noted that a trial had commenced and denied the State's motion. The State waived closing argument. Defense counsel argued in closing that the identity of Benjamin's

6

shooter had not been established, and Benjamin was not credible. Defense counsel further argued that the testimony regarding the relationship between the defendant and the owner of the red Monte Carlo was hearsay, stating this evidence

> "was never tied up. That statement was hearsay. We don't know what the knowledge— why the officer—how the officer obtained that knowledge, whether or not he had firsthand knowledge of it. We just know that the officer said he's known as the baby daddy. We don't know how he obtained that knowledge, as I said, whether it's firsthand knowledge. The State could have called witnesses to tie that up. They didn't call witnesses."

¶ 17    The trial court found the defendant guilty of attempted first degree murder, aggravated battery with a firearm, and aggravated unlawful use of a firearm. It recounted Benjamin's testimony that Benjamin was acquainted with the defendant, knew the defendant drove a red Monte Carlo, and that the defendant shot him several times with a rifle, including while he was lying on the ground. The court also noted the Monte Carlo was parked nearby the defendant's residence, and the rifle found in the car's trunk was the same as the one used in the shooting.

¶ 18    On November 14, 2022, defense counsel filed a motion for a new trial, arguing the evidence at trial was insufficient to prove beyond a reasonable doubt that the defendant shot Benjamin, and the trial court's verdict was against the manifest weight of the evidence. The trial court denied the motion based on three key pieces of evidence: (1) Benjamin identified the defendant as the person who shot him, (2) a rifle found in the Monte Carlo, and (3) the ballistics witness testified the shell casings recovered at the scene had been fired from the rifle found in the Monte Carlo.

¶ 19    On January 6, 2023, the court merged the aggravated battery conviction into the attempted first degree murder conviction and sentenced the defendant to 40 years in IDOC followed by 4 years' MSR for attempted murder and a consecutive 5-year IDOC sentence for aggravated

unlawful use of a weapon. After the denial of his motion to reconsider sentence, the defendant filed a timely appeal.

¶ 20                                    II. Analysis

¶ 21    On appeal, the defendant argues the evidence was insufficient to prove him guilty beyond a reasonable doubt, and trial counsel was ineffective for allowing the State to link the defendant and the Monte Carlo through an inadmissible hearsay claim that the car was registered to the mother of the defendant's child.

¶ 22    "When considering a challenge to a criminal conviction based upon the sufficiency of the evidence, [the reviewing court] must determine whether, after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt." *People v. Davila*, 2022 IL App (1st) 190882, ¶ 35 (citing *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006)). The function of the reviewing court "is not to retry the defendant or substitute [its] judgment for that of the trier of fact." *Id.* "Rather, the trier of fact remains responsible for making determinations regarding credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence." *Id.* "A conviction will not be set aside on appeal unless the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of the defendant's guilt." *Id.*

¶ 23    "Where, as here, identification is the main issue, the State must prove beyond a reasonable doubt the identity of the individual who committed the charged offense." *Id.* ¶ 36 (citing *People v. White*, 2017 IL App (1st) 142358, ¶ 15). "It is well established that a single positive identification by a witness who had ample opportunity for observation is sufficient to support a conviction." *Id.*

        "A trier of fact assesses the reliability of identification testimony in light of all the
        facts and circumstances based on the *Biggers* factors, including (1) the witness's

8

opportunity to view the offender at the time of the offense, (2) the witness's degree of attention at the time of the offense, (3) the accuracy of any previous description of the offender by the witness, (4) the degree of certainty shown by the witness in identifying the defendant, and (5) the length of time between the offense and the identification." *Id.* ¶ 37.

¶ 24 Here, the trial court found Benjamin to be credible. Benjamin testified that he knew the defendant and considered him a "friend." "[T]he persuasiveness of identification testimony continues to be strengthened by the witness's prior acquaintance with the accused." *Id.* ¶ 38 (citing *People v. Lerma*, 2021 IL App (1st) 181480, ¶ 91). Benjamin had been in the defendant's red Monte Carlo before August 27, 2020, and identified the defendant as the shooter at the hospital, in a photo lineup, and in court. Benjamin had ample opportunity to view the defendant at the time of the shooting, and his degree of attention was focused on the defendant, as he was aiming an AK-47 at him, even describing the defendant to have tears in his eyes. Benjamin testified the defendant shot him from three or four feet away, and he never named any other person as the shooter of the AK-47. Additionally, the written statements made by Benjamin after the initial investigation were not recantations, because they were not sworn statements made to the police. Further, neither of the statements ever stated that the defendant did not shoot Benjamin; only that Hines did not. Nonetheless, even assuming *arguendo* that Benjamin's statements were in some way recantations, "recantations are considered inherently unreliable." *People v. Evans*, 2017 IL App (1st) 143268, ¶ 41.

¶ 25 Finally, the defendant argues that Benjamin's prior criminal record was a basis to infer he would be less likely to be truthful in his testimony. However, the fact that the victim had prior convictions does not preclude the trial court from finding his testimony credible. In viewing the evidence in a light most favorable to the State, Benjamin's testimony identifying the defendant as

the shooter was not so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt as to the defendant's guilt. Consequently, the defendant's challenge to the sufficiency of the evidence, on the basis that Benjamin's identification of the defendant as the shooter was not credible, fails.

¶ 26 The defendant next argues that trial counsel was ineffective for allowing the State to introduce evidence linking the defendant to the Monte Carlo through inadmissible hearsay regarding the registered owner of the vehicle. At trial, the following colloquy occurred when Detective Hall was questioned by the State:

"Q. Okay. With respect to this vehicle, this red Monte Carlo, what was it particularly that caused you to take note of it and why?

A. The suspect vehicle given by Mr. Benjamin was a red Monte Carlo two-door that—I mean, that this matched the physical description of the suspect vehicle.

Q. And given that it matched the physical description that you—of a vehicle that you were looking for, did you do anything to try to determine the registered owner of the vehicle?

A. Yeah. So we ran the registration plate, and it checked to a Shambreah Williams and knew that Delahn Amos and Shambreah had a mutual child together."

¶ 27 The law is well established that in order for a criminal defendant to preserve an issue for appeal, the defendant must object at trial and raise the issue in a written posttrial motion. *People v. Reese*, 2017 IL 120011, ¶ 60. Failure to do both forfeits any review of the issue. *Id.* "We require this of defendants because failure to raise the issue at trial deprives the circuit court of an opportunity to correct the error, thereby wasting time and judicial resources." *People v. Jackson*,

2022 IL 127256, ¶ 15. The defendant neither objected to Detective Hall's testimony at trial nor raised it in his written posttrial motion; therefore, this issue is forfeited.

¶ 28    The defendant attempts to circumvent forfeiture by asserting ineffective assistance of counsel. Claims of ineffective assistance of counsel are resolved under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a defendant must demonstrate that counsel's performance was deficient and that such deficient performance substantially prejudiced the defendant. *Id.* at 687.

¶ 29    " 'In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently.' " *People v. Johnson*, 2021 IL 126291, ¶ 54 (quoting *Harrington v. Richter*, 562 U.S. 86, 111 (2011)). "Instead, *Strickland* asks whether it is 'reasonably likely' the result would have been different." *People v. Lewis*, 2022 IL 126705, ¶ 46. "When it is clear that the alleged error would not have affected the outcome of the case, a court of review need not engage in the meaningless endeavor of determining whether error occurred." *People v. White*, 2011 IL 109689, ¶ 148.

¶ 30    Here, because the evidence against the defendant was overwhelming, we cannot find that it is reasonably likely that the result would have been different if the testimony regarding Shambreah Williams had been excluded. Additionally, "the admission of hearsay identification testimony is harmless error when it is merely cumulative or is supported by a positive identification and other corroborative circumstances." (Internal quotation marks omitted.) *People v. Yancy*, 368 Ill. App. 3d 381, 385 (2005). Further, "[u]nlike a jury, a trial judge in a bench trial is presumed to know the law and to follow it and this presumption may only be rebutted when the record affirmatively shows otherwise." (Internal quotation marks omitted.) *Id.* at 386. Accordingly, since

11

the defendant cannot show prejudice under *Strickland*, his claim of ineffective assistance of counsel fails.

¶ 31                                  III. Conclusion

¶ 32    For the foregoing reasons, we affirm the defendant's convictions.


¶ 33    Affirmed.