2024 IL App (1st) 221648-U

No. 1-22-1648

Order filed June 27, 2024.

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 2016 CR 60263 |
| | ) | |
| HEZEKIAH ANTHONY, | ) | The Honorable |
| | ) | Joseph M. Claps |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment.

ORDER

¶ 1    *Held*: The evidence was sufficient to find defendant guilty of first degree murder beyond a reasonable doubt, where the eyewitnesses provided reliable identification evidence, and this court affirmed the decision of the trial court. However, because the trial court relied on improper aggravating factors at sentencing, this court remanded the cause for resentencing.

¶ 2    Following a bench trial, defendant Hezekiah Anthony was found guilty of first degree murder and sentenced to 21 years' imprisonment. On appeal, he challenges the sufficiency of the evidence to support his conviction beyond a reasonable doubt, contending the State's

identification evidence was problematic and no physical evidence tied him to the crime. Defendant also contends the trial court relied on improper aggravating factors at sentencing and therefore he is entitled to a new sentencing hearing. We affirm the trial court's judgment finding defendant guilty of murder but remand for a new sentencing hearing.

¶ 3                                    BACKGROUND

¶ 4     Defendant was arrested and initially charged with attempted murder and aggravated battery in 2014 after he stomped on Dora Nix-Corbin, a 5' 3", 130-pound woman in her mid-to-late 70s, also known as "Momma," knocking her out of her wheelchair and her glass eye to the ground.[1] Several people witnessed the offense, which took place July 26, 2014, around the Central Arms Hotel (520 East 47th Street, near Forrestville Avenue) in Chicago, a four-story building with some long-term residents. The cause proceeded to a bench trial, after which defendant was found guilty of aggravated battery to an individual 60 years of age or older and sentenced to a total of 8 years in prison.[2] The trial court found there was insufficient evidence that "defendant intended to kill," to sustain the attempted murder charge (count 1).

¶ 5     This court affirmed defendant's conviction on appeal, but vacated the aggravated battery sentences imposed on counts 3, 4, and 5, pursuant to the one-act, one crime doctrine. *People v. Anthony*, 2018 IL App (1st) 160894-U, ¶¶ 1, 28-31. Thus, defendant's conviction on count 2,

---

[1]The attempted murder charge specifically stated that defendant "without lawful justification, with intent to kill, did an act, to wit:  knocked Dora Nix-Corbin to the ground and stomped on her body, which constituted a substantial step towards the commission of first degree murder."

[2]The record suggests that Nix-Corbin was born on August 8, 1934, making her 79 at the time she was beaten. Nonetheless, we note that during the aggravated battery trial, the State admitted into evidence a certified copy of a birth certificate for Nix-Corbin, stating she was born August 8, 1939, which would then make her age 74. See *Anthony*, 2018 IL App (1st) 160894-U, ¶ 10.

Defendant was found guilty of counts 2 through 5, charging him with aggravated battery. He was sentenced on counts 2 and 4 to seven years' imprisonment and counts 3 and 5 to 8 years' imprisonment, all to run concurrently. On appeal, this court vacated the sentences imposed on counts 3, 4, and 5, pursuant to the one-act, one crime doctrine. *Anthony*, 2018 IL App (1st) 160894-U, ¶¶ 28-31.

aggravated battery causing great bodily harm to a person 60 years of age or older, was upheld, and this court ordered the circuit court clerk to correct the mittimus to reflect the accompanying seven-year prison term. *Id.* ¶ 31.

¶ 6     Nix-Corbin subsequently died on May 21, 2016, and defendant was then charged in November 2016 with the first degree murder of Nix-Corbin, insofar as his actions created a substantial probability of death or great bodily harm. The State proceeded to trial on that charge, adducing the following evidence as to defendant's identity and the cause of Nix-Corbin's death.

¶ 7     Deborah Norwood testified that on July 26, 2014, around 9:50 p.m., she was working private security at the Central Arms Hotel and standing outside looking around smoking a cigarette while a man named Chris spoke to her and flirted. On cross-examination, she added that another security guard was also participating in the conversation, and there were about three people down the block in front of the liquor store. However, "Momma" was sitting in her chair drinking a beer across from the hotel. Norwood said, "Momma, come on over here where I'm at," but Momma responded, "I'm okay." The area where Momma sat was well-lit and there was also a light fixture on the corner of Forrestville.

¶ 8     After a while Chris directed Norwood's attention back across the street, where Norwood saw a blue pickup truck in front of Momma and someone stomping on her. On cross, Norwood stated that at that point, she could only see a leg and not the face of the attacker. Norwood ran across the street, crossing paths with "the guy that did it," and said, "come here motherfucker," but a man later identified as defendant continued walking away. On cross, she clarified that defendant was standing next to Momma and in the process of leaving when Norwood arrived. In response to the question on cross, "And you didn't actually see anyone touch her?" Norwood reiterated that she had seen defendant "stomping her." Norwood then saw Momma lying on the

ground unconscious and bleeding from her head. There was a little pool of blood on the ground. Norwood shook Momma in an attempt to revive her and cried "please don't die on me." An ambulance was called. Norwood then flagged down an approaching police vehicle and told police that defendant had gone around the corner. Norwood described him as wearing a white t-shirt and khakis.

¶ 9     Momma soon revived, and paramedics bandaged her, but she declined hospital treatment. She was also missing her glass eye. Norwood noted on cross that she helped Momma back to her room at the hotel. The next morning, Momma failed to respond to the knock at her door. Norwood, with the property manager's help, entered the room to find Momma lying in bed unconscious, and she was taken to the hospital.

¶ 10     Norwood stated on cross that she had seen defendant in the building before, and she did not recall testifying in 2015 to the contrary. She also made an in-court identification of defendant as the offender. Norwood acknowledged that a detective showed her a photo array in August 2014, some days after the offense, but she was unable to identify anyone pictured. It was noted on cross that these same detectives asked Norwood if she had seen the offender's face, to which she replied she had only seen "the person from the back." On cross, she confirmed this statement, adding "but he turned around."

¶ 11     The State also adduced evidence from Elbert Smith, who testified that on the day in question, he was a third-floor resident at Central Arms Hotel with a window viewing the corner of 47th street and Forrestville Avenue. Around 9:50 p.m., he heard a loud voice from his room, prompting him to look out his window. On cross, Smith clarified that he was taking a nap, but the loud noises woke him up, and while he at first denied that his eyes were blurry on waking, he later acknowledged they were blurry, and he had a rag in his hand to wipe them. He then saw

defendant cross the street and stand by the pickup truck, about five feet from Forrestville Avenue. Defendant looked at Momma, who was also behind the truck, and said, "hey, hey bitch, where my $10 at bitch," then proceeded to punch her with a closed fist. He held onto the truck and stomped on her head. Defendant walked away, going to Forrestville, and he turned the corner. Smith then exited the building, and approached two security guards by Momma, who was bleeding with a gash on her head. Consistent with Norwood's testimony, Smith reported that Momma said she was fine and they walked Momma to her room, but the next morning she was taken to the hospital. Smith visited her there that day, but she was unable to talk.

¶ 12    On cross, Smith stated that he saw defendant's face and testified on direct that in fact he had seen defendant many times around the hotel. He identified defendant in court as the offender.  On cross, Smith acknowledged he spoke with police officers at the station on August 5, 2014, and he "could have told" police that he didn't see "Momma being stumped," but he did not remember. He insisted at trial, however, that he saw Momma "getting stumped."

¶ 13    Chicago police lieutenant Ronald Kimble testified that he was working as a sergeant between 9 p.m. and 10 p.m. on the evening in question. He was driving in an unmarked police vehicle westbound on 47th Street, near Forrestville, when three or four people on the north side of the street frantically waved him down, and he stopped his vehicle. Lieutenant Kimble saw an elderly woman lying on the ground between the sidewalk and the curb with injuries to her head, blood on her face, and an eye injury of some sort. There was also blood on the ground, and she was not moving at all. Those present pointed to a man walking away from them (on the same side of the street as Lieutenant Kimble) and said that he had just beaten and stomped on the woman. While still in his vehicle, Lieutenant Kimble followed the man, who turned the corner and walked very slowly as if "he hadn't done anything." Within a block, Lieutenant Kimble

stopped and detained the man, whom Lieutenant Kimble identified in court as defendant. Once defendant was detained, Lieutenant Kimble returned to the scene, and by then other officers had arrived. Nix-Corbin also was by that point awake and moving but incoherent and "kind of combative."

¶ 14    On cross, Lieutenant Kimble stated that defendant did not possess any weapons when detained. Defendant was wearing a light pale-colored shirt, but he could not remember the pants' color, and Lieutenant Kimble did not see any blood on defendant.

¶ 15    Dr. Matthew Brandon Maas, a neurologist at Northwestern Hospital, testified next that he was a treating physician for the victim Nix-Corbin and had reviewed her medical records. Nix-Corbin arrived at the hospital on July 27, 2014, unresponsive and comatose, and a team of physicians, including a neurologist, neurosurgeon, trauma specialists, and emergency medicine specialists, examined Nix-Corbin. A brain scan revealed that she had a substantial area of bleeding on the left side of her brain between the brain tissue and the skull, commonly called a subdural hemorrhage. Consequently, surgeons performed a decompressive hemicraniectomy, wherein they sawed off a large piece of Nix-Corbin's skull, removed it, and then opened up some layers between that and the brain and suctioned out the blood clot, thus permitting room for her swelling brain.

¶ 16    Dr. Maas testified that the blood clot seemed to have developed in the last day or two, which corresponded with the factual history reported of the assault on Nix-Corbin. In explaining how Nix-Corbin could decline medical treatment and walk to her apartment following the assault, but then be unconscious the next morning, Dr. Maas noted that the injury and symptoms of a subdural hemorrhage can take time to manifest themselves and it was "commonly observed that people with subdural hemorrhages don't perceive any symptoms when they first develop."

Had Nix-Corbin not received emergency medical attention, it would be unlikely she would survive another day. Dr. Maas eventually helped remove Nix-Corbin from the ventilators, placing a tracheostomy to allow Nix-Corbin to breathe on her own and a feeding tube for long-term nutrition. Nix-Corbin, who remained in a coma, was then discharged to a long-term care facility on August 9, 2014.

¶ 17    On cross, Dr. Maas stated that on her admission to the hospital, Nix-Corbin's toxicology screen detected barbiturates and cocaine, consistent with a reported history of IV drug abuse. Dr. Maas, however, did not note that this was an active matter in her care. He testified on redirect that drug abuse does not cause subdural hematomas. As set forth, Nix-Corbin died about two years later, on May 21, 2016.

¶ 18    Dr. Benjamin Soriano, a Cook County assistant medical examiner and expert in forensic pathology, testified that he subsequently performed an autopsy on Nix-Corbin. The autopsy revealed Nix-Corbin suffered from head trauma with complications of pneumonia urinary tract infections, and sepsis. Based on the autopsy and review of Nix-Corbin's medical history, Dr. Soriano opined that within a reasonable degree of medical and scientific certainty Nix-Corbin's cause of death was a complication of a "closed head injury due to assault" and the manner of death was a homicide. Following this evidence, the State rested. The trial court denied defendant's motion for a directed finding.

¶ 19    Defendant proceeded on a theory of misidentification, presenting the following evidence in his defense. Christopher Williams testified that between 9 p.m. and 10 p.m. on the day in question, he was standing outside the hotel talking to a female security guard, Norwood, and they were drinking alcohol. It was dark, and there was no one else in their immediate vicinity. Williams then noticed an old lady lying on the ground across the street. Williams directed the

security guard's attention to the woman on the ground. Williams, however, did not see anyone near the woman and did not see anyone strike the woman. Williams had seen defendant at the liquor store, located in a diagonal direction across the street from the hotel, but he did not know defendant and had no prior relationship with him. Williams made an in-court identification of defendant and testified he did not see defendant strike the woman on the ground. Williams acknowledged he was convicted of unlawful use of a weapon by a felon in 2019.

¶ 20 On cross, Williams testified that he first spoke with the security guard for some 10 or 20 minutes and then went to the liquor store, where he saw defendant, but he was unsure what time or what defendant wore. There was no one else just standing there that night. Following his outing to the liquor store, Williams returned to drink alcohol with the security guard. About 10 minutes later, Williams noticed the woman on the ground close to Forrestville Avenue. Williams crossed the street with the security guard, and stood there while the security guard tended to the woman. Then he walked away. Williams did not recall the security guard stating that a man was stomping on the woman.

¶ 21 Officer Roberto Ornelas testified next that he was a correctional officer at the Cook County jail, working in the male clothing property room and inventorying and itemizing detainee civilian clothing. Officer Ornelas testified that the clothing receipt, generated in the regular course of business during the inventory process and retained by the department, revealed that defendant was wearing a white shirt, gray pants, and red shoes with multicolored shoelaces when he was processed on July 27, 2014. The defense then rested.

¶ 22 Following evidence and argument, the court found the defense witnesses incredible. Accordingly, the court found the State had proved defendant guilty of the first degree murder of Nix-Corbin beyond a reasonable doubt and denied defendant's motion for a new trial. In doing

so, the court noted, "the fact that a witness may be impeached on some issue doesn't by itself negate the testimony. It never has and never will. It is the weight that the trier of fact gives to that inconsistency that counts."

¶ 23    The cause proceeded to sentencing, where the State argued in aggravation that defendant had prior felony convictions, including the aggravated battery conviction in this case that preceded the murder charge. The State argued defendant should be punished appropriately given that the crime involved extreme violence. The defense argued in mitigation that defendant was physically, emotionally, and sexually abused during his childhood. He had been honorably discharged from the military and suffered from posttraumatic stress disorder and manic depression, in addition to having shattered kneecaps due to gunshot wounds in both legs. He had obtained his GED, had worked as a freelance barber, and had a good relationship with his six children, four of them minors. The defense maintained the 2014 conviction for aggravated battery stemming from the same facts "should merge with the charges in this case," because aggravated battery "would have merged into the more serious charge" if both charges had issued at the same time. The defense asked for the minimum sentence.

¶ 24    The court stated:

"I have considered the PSI and factors in aggravation and mitigation. I have considered the Defense's argument for a sentence close to the minimum *** I have considered all that and your military service and the breadth and width of your prior record, the most serious of which is the conviction for the agg battery charge of the same incident. I have considered all that."

The court then sentenced defendant to 21 years' imprisonment with credit for time served on the aggravated battery conviction, precisely 2,959 days (or a little over 8 years) from defendant's arrest in 2014. This appeal followed.

¶ 25                                   ANALYSIS

¶ 26                          *Sufficiency of the Evidence*

¶ 27     Defendant now challenges the sufficiency of the evidence to sustain his conviction. When considering such a challenge, we must determine whether, after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Walls*, 2022 IL App (1st) 200167, ¶ 17. Under this standard, it's for the trier of fact to fairly resolve any conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009). As a reviewing court, we will not substitute our judgment for that of the trier of fact on issues involving the weight of the evidence or witness credibility. *Id*. at 224-25. A conviction will not be set aside on appeal unless the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of the defendant's guilt. *People v. Wright*, 2017 IL 119561, ¶ 70.

¶ 28     To prove defendant guilty of first degree murder, as charged, the State was required to establish that defendant knew that his actions of stomping on Nix-Corbin created a strong probability of death or great bodily harm. 720 ILCS 5/9-1(a)(2) (West 2014). On appeal, defendant does not contest that Nix-Corbin died from her head injuries two years after the stomping, but rather challenges his identity as the offender, contending the witness identifications were unreliable.

¶ 29     We first observe that defendant raised a similar challenge on appeal from his aggravated battery conviction, which arose from the same factual matrix as the present case.[3] He also claimed, as he does now, that no physical evidence tied him to the offense. Notably, both

_____

[3]Defendant, for his part, now concedes that defendant's "conviction for murder in this case is based on the same physical act — beating Nix-Corbin —[.]"

Norwood and Smith testified in defendant's 2015 bench trial, in addition to another hotel resident, as to the beating that rendered Nix-Corbin permanently "unresponsive and intubated" in a long-term care facility. *Anthony*, 2018 IL App (1st) 160894-U, ¶ 11. Based on that testimony, this court found the State had proved defendant guilty beyond a reasonable doubt of punching and then stomping on Nix-Corbin, thus causing great bodily harm to a person 60 years of age or older. *Id.*, ¶ 20. Under the doctrine of collateral estoppel, when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.[4] *Ashe v. Swenson*, 397 U.S. 436, 443 (1970); see also *People v. Tenner*, 206 Ill. 2d 381, 396 (2002) (noting, collateral estoppel bars the litigation of an issue that was decided in a prior case).[5] The State nonetheless did not raise collateral estoppel on the identity issue in the court below, nor does it argue estoppel at present, thus forfeiting the matter. See *People v. Lucas*, 231 Ill. 2d 169, 175 (2008) (noting, the doctrine of forfeiture applies to the State, as well). We therefore proceed to the merits.

¶ 30     Defendant now specifically contends that Norwood and Smith had a limited opportunity to view defendant. He maintains neither could see defendant from across the street on that dark night. In addition, he alleges their testimony was unclear, inconsistent and impeached in significant regards.

---

[4]The party seeking to invoke collateral estoppel must show that (1) the issue sought to be precluded was raised and litigated in a previous proceeding, (2) the determination of the issue was a critical and necessary part of the final judgment in a prior trial, and (3) the issue is the same one decided in the previous trial. *People v. Jones*, 207 Ill. 2d 122, 139 (2003).

[5]Although the analyses remain the same, this case could possibly be described as "direct estoppel." *U.S. v. Bailin*, 977 F. 2d 270, 276 (1992); see also *People v. Wharton*, 334 Ill. App. 3d 1066, 1078 (2002) (noting, retrial is not collateral if it is a continuation of the first trial). "Direct estoppel prevents a party from relitigating a fact which was already determined against it in 'a decision that finally disposes of a part of a claim on the merits but does not preclude all further action on the remainder of the claim; issues common to both parts of the claim are precluded, even though new issues remain to be decided.' " *Id.*

¶ 31    However, it remains the case that a single positive identification by a witness who had ample opportunity for observation is sufficient to support a conviction. *People v. Davila*, 2022 IL App (1st) 190882, ¶ 36. A trier of fact assesses the reliability of identification testimony in light of all the facts and circumstances under *Neil v. Biggers*, 409 U.S. 188 (1972), including (1) the witness's opportunity to view the offender at the time of the offense, (2) the witness's degree of attention at the time of the offense, (3) the accuracy of any previous description of the offender by the witness, (4) the degree of certainty shown by the witness in identifying the defendant, and (5) the length of time between the offense and the identification. *Id.* ¶ 37; *People v. Guerrero*, 2020 IL App (1st) 172156, ¶ 32. The "*Biggers* factors" continue to be the gold standard for assessing evidence where a defendant's identity is at issue. See *People v. Macklin*, 2019 IL App (1st) 161165, ¶¶ 22-23. No single factor is dispositive, and the identification's reliability is based on the totality of the circumstances. *People v. Simmons*, 2016 IL App (1st) 131300, ¶ 89. Each case must be judged on its own facts against the touchstone of the reasonable doubt standard. *People v. Lerma*, 2021 IL App (1st) 181480, ¶ 91.

¶ 32    Here, after carefully reviewing the evidence under that standard in a light most favorable to the State, we cannot say Norwood and Smith's combined testimony identifying defendant as the offender was so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt as to defendant's guilt. First, both Norwood and Smith had ample opportunity to view the offender at the time of the offense on July 26, 2014, around 9:50 p.m. Norwood testified that she was working as private security and essentially taking a smoke break outside the hotel, standing there along with a man named Chris and another security guard while Nix-Corbin sat alone, only across the street in her wheel chair, drinking a beer. A group congregated at the liquor store just down the street. Norwood asked Nix-Corbin to join them, but she remained there in the well-lit

area. There was also lighting at the corner of Forrestville, not far from where Nix-Corbin sat. Norwood then saw the leg of the attacker stomping upon Nix-Corbin behind a blue pickup truck. Norwood ran across the street, crossing paths with defendant and told him to come here, but he kept walking around the corner. On cross, she clarified that defendant was standing next to Nix-Corbin and in the process of leaving when Norwood arrived. Norwood then saw Nix-Corbin lying on the ground unconscious and bleeding from her head.

¶ 33    Smith, having an elevated viewpoint, testified that a loud noise prompted him to look out the window. He saw defendant cross the street, stand by a pickup truck (about five feet from Forrestville), near Nix-Corbin, and say, "hey, hey bitch, where my $10 at bitch." Smith testified that defendant proceeded to punch Nix-Corbin with a closed fist, then held onto the truck and stomped on her head. Defendant walked away, going to Forrestville, and he turned the corner. Smith then exited the building, and approached two security guards by Nix-Corbin, who was bleeding with a gash on her head.

¶ 34    Moreover, Norwood and Smith's testimony was consistent in significant regards as to the time of the offense, where it took place (across the street from the hotel and near Forrestville), the presence of the pickup truck, defendant's manner of stomping on Nix-Corbin, and his apparently casual manner of walking away from the scene after having caused deathly blows to Nix-Corbin's head. Smith noted the presence of two security guards after the stomping, while Norwood noted she had been standing outside the hotel with another security guard prior to the offense. Moreover, Lieutenant Kimble testified that he was stopped by three or four people, consistent with the fact that Norwood, another security guard, and later Smith, were outside, attending to Nix-Corbin. Lieutenant Kimble also confirmed Nix-Corbin's head injuries, and that those present pointed to defendant, who was walking away and turned the corner as Lieutenant

Kimble followed him. Based on the foregoing, the identification witnesses had ample opportunity to view defendant as the offender, and they were in a position to view him.

¶ 35    As to the second factor, this also weighs in the State's favor. While Norwood's attention was at first focused on those around her, she was attuned enough to know Nix-Corbin was siting across the street, and as stated, had just spoken to her prior to the offense. The State's evidence demonstrates that once Norwood realized Nix-Corbin was being stomped upon, she focused directly on the scene unfolding before her and the offender. Likewise, while Smith had just awoken from a nap, his testimony demonstrated his focus was on the scene of the offense.

¶ 36    Defendant attempts to cast doubt on Smith's attention, noting that Smith at first denied that his eyes were blurry on waking to the loud noise and looking out the window, but he then acknowledged they were blurry, and he had a rag in his hand to wipe them. Yet, viewing the evidence in the light most reasonable to the State, Smith still testified that he looked across the street and saw defendant. Defendant's complaint goes to the weight of the evidence and credibility of the witness, which is exclusively within the fact finder's realm. See *Siguenza-Brito*, 235 Ill. 2d at 224.

¶ 37    As to the third factor, the accuracy of any previous description of the offender by the witness, this factor weighs in favor of the State. Although neither Norwood nor Smith provided a detailed description of defendant's race, sex, age, height, weight, hair color, or hair style at this trial, they did not need to. Lieutenant Kimble showed immediately on the scene, and those present were able to point to defendant as he walked away. Lieutenant Kimble then followed defendant around the corner, arresting him. In that sense, the identification of defendant was more akin to a show-up. See *People v. Lippert*, 89 Ill. 2d 171, 188 (1982) (noting, "prompt show-ups near the scene of the crime as acceptable police procedure designed to aid police in

determining whether to continue or to end the search for the culprits"). There is no evidence that there were multiple possible offenders within the vicinity of Nix-Corbin or that Norwood pointed to anyone else other than defendant. See *People v. Smith*, 215 Ill. App. 3d 1029, 1036 (1991) (finding the fact that the victim never identified another person as her attacker, although the victim had the opportunity, strengthened reliability). Likewise, there is no evidence that Lieutenant Kimble was following anyone other than defendant.

¶ 38     Regardless, a general description by a witness does not necessarily render the witness's identification unreliable, and a witness need not distinguish a suspect's individual and separate features. *Macklin*, 2019 IL App (1st) 161165, ¶ 28. Here, the evidence suggests that defendant was detained and arrested on the scene July 26, 2014, although his clothing was not inventoried until the next day.[6] The inventory receipt, according to defendant's own witness, shows he was wearing a white t-shirt and gray pants, which is consistent with Norwood's general description of defendant wearing a white t-shirt and khakis the night of the offense.

¶ 39     As to the fourth *Biggers* factor, the degree of certainty shown by the witness in identifying the defendant, defendant acknowledges that both Norwood and Smith identified defendant in court as the offender. Defendant asks this court to disregard this factor because he claims expert research shows low correlations between a witness's confidence and the accuracy of their identification. Defendant did not present this evidence at trial. And, he fails to cite any authority that courts must disregard the fourth *Biggers* factor in light of that research, thus

---

[6]The impounded record underlying defendant's direct appeal in Anthony, 2018 IL App (1st) 160894-U (No. 14 CR 60065), contains an arrest report for the aggravated battery of Nix-Corbin reflecting that defendant was arrested on September 30, 2014. The police noted defendant was observed "busting out the windows of a taxi cab" and a subsequent name check revealed two investigative alerts with probable cause for arrest. The parties do not make clear the exact date defendant was initially detained and arrested for the aggravated battery of Nix-Corbin in July 2014 or why he was apparently subsequently released until September 2014.

forfeiting the matter. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); *Simmons*, 2016 IL App (1st) 131300, ¶ 96 (rejecting a similar argument).

¶ 40    Defendant also argues the trial identifications resulted from defendant "evidently wearing jail clothes." In support, he notes that for her in-court identification, Norwood described defendant's brown khaki shirt. The record does not establish what defendant wore at trial, and defendant did not submit an offer of proof on the matter or raise any objection, resulting in forfeiture. See *People v. Sebby*, 2017 IL 119445, ¶ 48; *People v. Andrews*, 146 Ill. 2d 413, 421 (1992) (noting, the purpose of an offer of proof is to disclose the nature of the offered evidence). Also, [i]t is axiomatic that it is improper to draw an inference in favor of a defendant based on material missing from the record." *Macklin*, 2019 IL App (1st) 161165, ¶ 27. In addition, he omits that Smith (apparently an elderly witness) took some time to identify defendant in court, which contradicts his contention that he was only identified based on his jail outfit. Moreover, Smith testified that in fact he had seen defendant many times around the hotel. The persuasiveness of identification testimony continues to be strengthened by the witness's prior acquaintance with the accused. *Davila*, 2022 IL App (1st) 190882, ¶ 38.

¶ 41    As to the final *Biggers* factor, the length of time between the offense and the identification, we would again note that defendant was immediately identified on the scene by those present, per Lieutenant Kimble, and thereafter detained. This weighs in the State's favor. In addition, both Norwood and Smith testified at defendant's June 2015 trial for aggravated battery, which defendant now concedes arises from the same beating of Nix-Corbin, and Norwood identified defendant in court as the offender. See *Anthony*, 2018 IL App (1st) 160894-U, ¶ 8. Norwood and Smith identified defendant again as the offender during the present murder trial. Although defendant established on cross that Norwood did not identify defendant from a photo

array shown to her by a detective, defendant failed to establish at trial that his photograph was actually contained in that photo array. Even assuming it was, this does not significantly detract from the positive identification evidence set forth above. We thus reject defendant's contention that over seven years passed before Norwood and Smith identified defendant. The record belies this disingenuous argument.

¶ 42 Defendant still maintains the identification evidence was insufficient to support his conviction. He specifically challenges Smith's opportunity to view, and in support points to defense counsel's cross of Smith at trial. During cross, the defense noted that Smith had previously testified in 2015 that he could not see defendant's face, and he omitted telling police officers about the truck. Yet, in the same breath at defendant's murder trial, Smith also stated definitively that "I'd seen Momma getting stumped," and that he did not recall what he told officers after the offense. He further stated he looked right out the window and saw the attack. It's for the trier of fact to resolve discrepancies in testimony, and the trier of fact is free to accept or reject as much or as little of a witness's testimony as it pleases. *People v. Peoples*, 2015 IL App (1st) 121717, ¶ 67. Also, it's sufficient if all of the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt. *Id.*; *cf. In re O.F.*, 2020 IL App (1st) 190662, ¶¶ 34-48 (finding identification unreliable where a single witness viewed the defendant for moments in "unfavorable conditions," including vantage point, lighting, and with admitted inattention, and also failed to give an accurate prior description). That was and is the case here.

¶ 43 Defendant similarly notes that, on cross, Norwood stated that she had seen defendant in the building before, which defendant contended contrasted with her 2015 testimony. At that time, Norwood stated she had never seen defendant before. While defense counsel elicited this discrepancy on cross, Norwood also stated she did not recall being asked that question in 2015 or

giving that answer. Defendant has not cited the 2015 transcript on which his question was based. His point is thus unsupported. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (requiring the argument to contain pages of the record relied on). In any event, we reject this argument for the reasons already stated above. Defendant's challenge to the sufficiency of the evidence must fail.

¶ 44                                    *Sentencing*

¶ 45     Defendant next challenges his sentence. A trial court's sentencing decisions are entitled to great deference and weight. *People v. Fern*, 189 Ill. 2d 48, 53 (1999); *People v. Cox*, 377 Ill. App. 3d 690, 709 (2007). A sentence within the statutory guidelines is presumptively correct, and a trial court's sentencing decision will not be disturbed, absent an abuse of discretion. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46; *Cox*, 377 Ill. App. 3d at 709.

¶ 46     Here, the trial court found defendant guilty of first degree murder, which carries a sentence of 20 to 60 years. 720 ILCS 5/9-1(a)(2) (West 2014); 730 ILCS 5/5-4.5-20 (West 2014 & West 2022). The court then sentenced defendant to 21 years in prison, one year above the minimum. Defendant now contends the trial court relied on an improper factor in fashioning his sentence, as well as void convictions, and therefore he is entitled to a new sentencing hearing. The State contends the sentencing hearing shows otherwise.

¶ 47     A trial court is prohibited from considering incompetent evidence or improper aggravating factors at sentencing, and a sentence based on an improper factor in aggravation constitutes an abuse of discretion. *People v. Cross*, 2019 IL App (1st) 162108, ¶ 190; *People v. Minter*, 2015 IL App (1st) 120958, ¶ 147. Yet, the question of whether a trial court considered an improper factor in imposing a sentence is a question of law, which we review *de novo*. *People v. Streator*, 2023 IL App (1st) 220640, ¶ 73. A sentence based on an improper aggravating factor will not be affirmed unless the reviewing court can determine from the record that the weight

accorded the factor was so insignificant that it did not lead to a greater sentence. *People v. Heider*, 231 Ill. 2d 1, 21 (2008). The defendant bears the burden of affirmatively showing the error. *People v. Burnette*, 325 Ill. App. 3d 792, 809 (2001).

¶ 48    Here, the presentence investigation report showed that defendant had three convictions for aggravated unlawful use of a weapon (AUUW) from 2003 and 2004, for which defendant was previously sentenced to 2 years in the department of corrections. Defendant maintains, and the State concedes, that these convictions are void pursuant to *In re N.G.*, 2018 IL 121939, as they were based on a facially unconstitutional law. See also *People v. Alexander*, 2019 IL App (3d) 170168, ¶ 25. Nonetheless, at the sentencing hearing in this case, the State noted in aggravation the violent nature of the offense and defendant's criminal history, including a "gun charge from 2004" (although the State said it would not rely on that "too heavily"). In an effort to downplay the violence involved in the present case, the defense observed that the State had not charged defendant with an "intent to kill," and no weapon was used in the murder of Nix-Corbin. The defense argued defendant had little in his background, observing, in response to the State's argument, that the three "agg UUW convictions *** were all concurrent, two years IDOC."

¶ 49    As set forth, the court, in issuing the 21-year sentence, stated:

"I have considered the PSI and factors in aggravation and mitigation. I have considered the Defense's argument for a sentence close to the minimum *** I have considered all that and your military service and the breadth and width of your prior record, the most serious of which is the conviction for the agg battery charge of the same incident. I have considered all that."

¶ 50    The State does not now dispute that it's improper for the court to base its sentencing decision on a void conviction but maintains "there's nothing in the record to intimate the court

considered defendant's past gun convictions." This argument is belied by the record, which demonstrates the court considered the PSI and also defendant's prior criminal record, undeniably encompassing the void convictions, and the State also essentially asked the court to consider the void convictions in sentencing defendant. See 730 ILCS 5/5-5-3.2(a)(3) (West 2022) (noting, criminal history may be considered in aggravation); 730 ILCS 5/5-4-1(West 2022) (a court must consider the defendant's PSI at sentencing). This requires remand for resentencing. See *Cross*, 2019 IL App (1st) 162108, ¶ 202; *Alexander*, 2019 IL App (3d) 170168, ¶¶ 22, 29 (noting, an "AUUW conviction cannot be used for any purpose, including to increase his punishment for a new offense"). Based on the record, we cannot say the weight accorded the void convictions was so insignificant that it did not lead to a greater sentence. See *Heider*, 231 Ill. 2d at 21; *cf. People v. Bridges*, 2020 IL App (1st) 170129, ¶ 39 (declining remand, where the record clearly established that the defendant's AUUW conviction did not affect the trial court's sentencing decision).

¶ 51     The State also argues this was invited error, noting the record is silent as to any previous attempts defendant took to vacate the convictions and noting defense counsel, himself, referenced the convictions at sentencing. The State has not cited any authority for its invited error argument, thus forfeiting the matter. See Ill. S. Ct. R. 341(h)(7), (i) (eff. Oct. 1, 2020) (requiring the appellee to support contentions with citation to the authorities and the record relied on). Moreover, we question whether the doctrine of invited error can be applied in this instance, where it's not clear the extent to which the court considered defendant's void *ab initio* convictions at sentencing. See *N.G.*, 2018 IL 121939, ¶¶ 36, 38, 74; *People v. Brown*, 2023 IL App (2d) 220334, ¶ 36 (noting that void orders are not subject to invited-error rule). Indeed, a facially unconstitutional statute is void *ab initio*, as if the law were never passed; "[i]t was not, is

not, and could never be a crime." *N.G.*, 2018 IL 121939, ¶¶ 36, 50. The State "is precluded from using past convictions under the facially unconstitutional law in any subsequent proceedings ' " 'to support guilt or enhance punishment for another offense,' " ' " and the conviction must be treated by the courts as if it did not exist. *N.G.*, 2018 IL 121939, ¶¶ 36, 38, 74.

¶ 52    Next, defendant contends, and the State agrees, that his AUUW convictions must be vacated.[7] See *Cross*, 2019 IL App (1st) 162108, ¶ 182-87 (citing *N.G.*, 2018 IL 121939, ¶ 42, and noting, courts have an affirmative duty to invalidate unconstitutional AUUW convictions, provided the defendant raises the matter in an appropriate pleading before a court with jurisdiction). In the case at bar, defendant attached to his brief both the mittimuses and information (charging documents) from his AUUW convictions. We may take judicial notice of those documents. See *People v. Matthews*, 2022 IL App (4th) 210752, ¶ 35; *Cross*, 2019 IL App (1st) 162108, ¶ 185. In addition, we have his presentence investigation report. Accordingly, we direct the clerk of the circuit court to vacate each of the three void AUUW convictions in 04 CR 0814501; 03 CR 0712801; 03 CR 0664801.[8]

¶ 53    Last, defendant argues the aggravated battery and murder convictions in this case arose from the same act, the beating of Nix-Corbin. Drawing on one-act, one-crime principles,

---

[7]We note the discrepancy between the heading and the content of the State's brief on this point. In the heading, the State writes:  "This appeal is not the vehicle by which defendant's *Aguilar* convictions in three unrelated matters should be vacated." But, then in the content, the State writes that "the People agree defendant's *Agular*-era [*sic*] gun convictions should be vacated." Given our affirmative duty to invalidate unconstitutional AUUW convictions as cited above, we credit the State's concession.

[8]We note that the charging document for count 1 in the AUUW case of 04 CR 0814501 misstates the case number as "04CR-8154." All other counts in the charging documents and the information correspond with the correct lower court numbers. In addition, the charging documents for 03 CR 0664801 do not bear the case number.

defendant argues that his aggravated battery conviction constituted a less serious offense and, as such, it could not be considered in aggravation.[9] We agree.

¶ 54    Under one-act, one-crime principles, multiple convictions are improper if they are based on precisely the same physical act. *People v. Rodriguez*, 169 Ill. 2d 183, 186 (1996). An "act" is any overt or outward manifestation that will support a separate offense. *People v. Crespo*, 203 Ill. 2d 335, 341 (2001). For example, separate blows, although closely related, can constitute separate acts which could properly support multiple convictions. *Id.* at 342. Whether that's the case depends on the charging instruments. *Id.* Likewise, so long as there are multiple acts, their interrelationship does not preclude multiple convictions. *People v. Coats*, 2018 IL 121926, ¶ 16; see, *e.g.*, *People v. Marston*, 353 Ill. App. 3d 513, 519 (2004) (noting, multiple convictions for home invasion and aggravated battery were proper despite the common act of beating the victim, where the defendant's home entry was a separate act supporting the home invasion). Further, if exactly the same physical act does form the basis for more than one offense, a defendant may still be prosecuted for each offense, but only one conviction and sentence may be imposed. *People v. Segara*, 126 Ill. 2d 70, 77 (1988); see, *e.g.*, *People v. Sapp*, 2022 IL App (1st) 200436, ¶ 75 (noting, a defendant cannot be convicted for multiple crimes relating to the use of a firearm when only one firearm was involved). When multiple convictions are obtained for offenses

---

[9]In his opening brief, and contrary to the State's contention otherwise, defendant argues this qualifies as second-prong plain error. In his reply brief, defendant maintains he in fact preserved the matter and mistakenly argued plain error in his opening brief. Normally, "[p]oints not argued are forfeited and shall not be raised in the reply brief." Ill. S. Ct. 341(h)(7) (Oct. 1, 2020). We need not address the matter of forfeiture because regardless, a sentence based on an improper factor constitutes second-prong plain error. See *People v. Lee*, 213 Ill. 2d 218, 226 (2004) (noting, a one-act, one-crime violation affects the integrity of the judicial process and, therefore, satisfies the plain error rule); *People v. Whitney*, 297 Ill. App. 3d 965, 969 (1998), affirming in *People v. Whitney*, 188 Ill. 2d 91 (1999). Prejudice results where multiple convictions arise from precisely the same criminal conduct. *Coats*, 2018 IL 121926, ¶ 11.

We also note, as elucidated later, that defendant misspeaks in arguing the court relied on a "lesser-included offense." We take this argument to mean a less serious offense.

arising from a single act, a sentence should be imposed on the more serious offense, and the conviction on the less serious offense should be vacated. *Lee*, 213 Ill. 2d at, 226-27; *Sapp*, 2022 IL App (1st) 200436, ¶ 76.

¶ 55    Here, the first degree murder charge specifically stated that defendant, without lawful justification, beat Nix-Corbin knowing that such an act created a strong probability of death or great bodily harm to Nix-Corbin, thereby causing the death of Nix-Corbin on May 29, 2016. Prior to her death, in 2014, the State charged defendant with aggravated battery in that defendant, knowingly and without lawful justification, knocked Nix-Corbin to the ground and stomped on her body, thereby causing great bodily harm to Nix-Corbin, who was 60 years of age or older.[10] See 720 ILCS 5/12-3.05(a)(4) (West 2014).

¶ 56    Thus, as charged and proven, the same beating caused both the bodily harm to Nix-Corbin, and ultimately her death, as demonstrated at the murder trial. See *Anthony*, 2018 IL App (1st) 160894-U, ¶ 28 (noting, all aggravated battery counts were "based upon the the the same *** beating of Nix"). Although it could have, the State did not differentiate between the separate beatings. Rather, these counts charge defendant with the same conduct under different theories of criminal culpability. Contrary to the State's argument, the death of Nix-Corbin is not an "overt or outward manifestation" or "act" but a consequence of an act. Therefore, both the first degree murder and aggravated battery convictions were based on the same act, notwithstanding the delay in Nix-Corbin's death. See *People v. Harvey*, 211 Ill. 2d 368, 391 (2004) (noting that the passage of time is "not an overt or outward manifestation" or "act" but an external factor permitting the State to charge the defendant with a separate offense); *People v. Sienkiewicz*, 208 Ill. 2d 1, 10 (2003) (finding defendant's reckless driving conviction and reckless homicide

---

[10]The parties do not rely on the aggravated battery counts vacated on appeal, so they do not factor into our analysis.

charges arose from the same act); *People v. Mims*, 2014 IL App (1st) 082747-B, ¶ 46 (finding the defendant's conviction for aggravated battery with a firearm violated the one-act, one-crime rule because it was predicated on the same act as his attempted murder conviction, which was shooting the victim with a firearm).

¶ 57    Because defendant was tried for the aggravated battery years prior to the present offense, he is *not* asking that we vacate the less serious offense, and indeed we cannot, as we have no jurisdiction over that matter. See *People v. Lyles*, 217 Ill. 2d 210, 217 (2005) (recognizing that once the period for filing a petition for rehearing has passed, the appellate court lacks jurisdiction to take any further action). Rather, defendant maintains that because both offenses arose from the same facts, the aggravated battery should not have been used to increase his sentence for the more serious offense of murder.[11] The State does not dispute that it was improper to rely on the aggravated battery but argues the trial court did not rely on the aggravated battery at sentencing. As before, we find the State's argument is belied by the record. Based on the record, we cannot say the weight accorded the aggravated battery conviction was so insignificant that it did not lead to a greater sentence. See *Heider*, 231 Ill. 2d at 21.

¶ 58    The State nonetheless appears to assert, the fact that defendant received presentence custody credit for time served reflects that the trial court did not consider the aggravated battery conviction in aggravation at sentencing or result in prejudice. We note the State's argument as to presentence custody credit is not well-taken, as it is unclear, conclusory, and lacks citation to any legal authority. See Ill. S. Ct. R. 341(h)(7), (i) (eff. Oct. 1, 2020); *People v. Chatman*, 2016 IL

---

[11]We note that the same act constituted a violation of two distinct statutory provisions, but each offense required proof of an additional element not required to prove the other offense; as such, the two offenses are not the same for double jeopardy purposes. See *People v. Henry*, 204 Ill. 2d 267, 290 (2003). For that same reason, as charged, the aggravated battery was not a lesser included offense of murder in this case. See *Sienkiewicz*, 208 Ill. 2d at 10-11.

App (1st) 152395, ¶ 45, fn. 19 (noting, a reviewing court is entitled to have issues clearly defined with relevant authority cited); see also *People v. Latona*, 184 Ill. 2d 260, 270 (1998) (noting that in-custody credit is not limited to a single sentence, provided that the sentences are concurrent); 730 ILCS 5/5-8-4 (West 2020). The separate matter of sentencing credit is not before us on appeal, and the State has not established how it impacts the issues at hand. The parties will have the opportunity on remand to investigate and brief the issue further should they desire.

¶ 59    Accordingly, on remand, the trial court is prohibited from relying on the aggravated battery conviction in aggravation at sentencing. *Cf*. *Burnette*, 325 Ill. App. 3d at 809 (noting, the consideration of a factor which is necessarily implicit in an offense cannot be used as an aggravating factor in sentencing). We therefore vacate the sentence. However, this does not preclude the same 21-year sentence from being issued on remand provided it's based on proper sentencing factors.

¶ 60                                          CONCLUSION

¶ 61    For the reasons stated, we affirm the judgment of the trial court finding defendant guilty of first degree murder. We remand the matter for resentencing, and we direct the clerk of the circuit court to vacate each of the three void AUUW convictions in 04 CR 0814501; 03 CR 0712801; 03 CR 0664801.

¶ 62    Affirmed in part and vacated in part; cause remanded for resentencing with directions.